FATHOM EXPEDITIONS, INC., a corporation, et al., Plaintiffs,

v.

M/T GAVRION, her engines, etc., et al., Defendants.

No. 72–772–Civ–J–T.

United States District Court,
M. D. Florida,
Jacksonville Division.

July 2, 1975.

Wahl & Gabel, Jacksonville, Fla., for plaintiffs and intervening plaintiffs; Harold B. Wahl, Jacksonville, Fla., of counsel.

Toole, Taylor, Moseley & Milton, Jacksonville, Fla., for claimant; James F. Moseley, Joseph P. Milton, Jacksonville, Fla., of counsel.

John B. Culp, Jr., Jacksonville, Fla., for intervenors.

## OPINION

IRVING BEN COOPER, District Judge, Sitting by Designation.

### Introduction

This litigation results from a collision between two ships, the R/V Fathom II ("Fathom") and the M/T Gavrion ("Gavrion"), early in the morning of October 16, 1972, in the Atlantic Ocean at the mouth of the St. Johns River at Jacksonville, Florida. The Fathom was a research vessel converted from a mine sweeper, about 230 gross tons and 125 feet long; the Gavrion an ocean-going tanker about 13,400 gross tons and 579 feet long. As a result of the collision the Fathom was cut in half and sunk. All seven crewmen on board were rescued.

### 1. Procedural History

A recitation of this action's complicated procedural history is necessary to understand its present posture before us. After the collision Fathom Expeditions, Inc. ("Fathom Exp."), owner and operator of the Fathom, and Associates Capital Co., the holder of a mortgage on the vessel, brought this action *in rem* against the Gavrion to recover for the loss of the Fathom, claiming that the collision was solely the fault of the Gavrion. Thereafter, intervening as plaintiffs, Douglas Batchelder and six others who were the crew of the Fathom ("Batchelder, et al."), filed a complaint against the Gavrion seeking damages for personal injuries, physical and mental pain and suffering, and loss of personal effects. The Gavrion answered denying liability and counterclaimed alleging that the collision was solely the fault of the Fathom.

The Fathom was essentially a treasure hunting vessel. During the summer of 1971, in response to advertisements placed by Fathom Exp., Urban Anderson and 21 others engaged with Fathom Exp. to participate in an expedition on the Fathom off the coast of Nicaragua. Each contributed $3,000 and expected to share with Fathom Exp. in the profits of this highly speculative venture. These joint venturers ("Anderson, et al.") intervened in this litigation against Fathom Exp. seeking an accounting and damages for breach of contract and conversion.

A letter to Fathom Exp.'s attorney from its president dated January 16, 1973 (Exhibit C) states that at a meeting of the corporation held on January 14, 1973 (at which a quorum was present) the following resolution was passed: "For various legal and financial reasons we hereby resolve to dismiss any further litigation against the motor vessel Gavrion, which was involved in a collision with the R/V Fathom II." The letter also contained instructions to its attor-

ney to instigate whatever action was necessary to dismiss the pending litigation. No such order was ever entered. At trial, however, Harold Wahl, Esq., Fathom Exp.'s former attorney, and counsel to the intervening seamen, Batchelder, et al., stated on the record that Fathom Exp. withdrew its claim. (Tr. 8)[1] On May 15, 1974 the complaint of Associates Capital Co., Fathom Exp.'s co-plaintiff, was dismissed on its own motion by order of Judge Tjoflat.

The United States then brought suit against both Fathom Exp. and Gavrion Shipping Corp. of Greece, owner and operator of the Gavrion, to recover the costs of removing the wreckage of the Fathom from the channel in which it had sunk. That action was consolidated with the present action; it was later settled and ordered dismissed by this Court on March 10, 1975 on stipulation between the United States and Gavrion Shipping Corp.

Upon the withdrawal by Fathom Exp. and Associates Capital from the case, the intervening joint venturers, Anderson, et al., sought to continue the litigation against the Gavrion in their place as third party beneficiaries. The Gavrion vigorously disputes their presence. Judge Tjoflat ordered that Anderson, et al., were entitled to appear for Fathom, and, on the Gavrion's petition for rehearing, upheld that order, at least for the purposes of trial before us.

## 2. Issues

Trial was conducted before the Court on three issues:

(1) Liability between the Fathom and the Gavrion in causing the collision;

(2) Liability of the Gavrion to the seamen, Batchelder, et al.; damages, if any, suffered as a result of the collision, and contributory negligence of some or any of them;

(3) Whether the complaint of the joint venturers, Anderson, et al., establishes such a claim that they are entitled to proceed on behalf of the Fathom against the Gavrion.

Damages is an issue only as to the seamen, Batchelder, et al.; damage suffered by the vessels or by Anderson, et al., is not before us.

## 3. The Collision

The facts of the collision, very briefly, are these: Shortly before six on the morning of October 16, 1972, the Fathom weighed anchor at the anchorage grounds near the St. Johns River at Jacksonville, Florida, and proceeded to follow the pilot boat toward buoy No. 4. She proceeded on a southerly course toward that buoy at about seven knots and about one hundred yards behind the pilot boat until the buoy was in sight. The Captain of the Fathom, Douglas Batchelder, was on the wing of the bridge; the Chief Mate, John Bush, was steering the vessel. No lookout had been posted. When the Fathom had nearly gotten to the buoy, the pilot boat turned around and headed back; Batchelder went down from the pilot house to a position on the starboard side of the deckhouse; at about that time Bush saw the Gavrion on his port side. At this point the Gavrion was no more than 150 yards away; Bush put on emergency speed and came hard right. The bow of the Gavrion collided with the port side of the Fathom about fifty feet from the stern. The Fathom was cut in two, the stern section sinking first. Immediately after the collision the pilot boat pulled along side the bow section, on which the seamen had gathered. They were brought aboard the pilot boat and then taken ashore. (Tr. 112–120; Ex. 1, pp. 24, 34–35, 39–41, 43–45, 52; Ex. 6, pp. 98–99)

At the outset we note two items of importance. First, there is no question that the Gavrion was at fault. Despite their counterclaim alleging sole liability of the Fathom, the Gavrion now con-

---

1. The notation "Tr." followed by a number refers to the official transcript of the proceedings before us.

cedes that it was at fault. (Tr. 77) The question here really is, to what extent, if any, was the Fathom at fault. Second, the law governing our decision has changed. Under the old rule, our decision would have been either that the collision was solely the fault of the Gavrion, or else that it was a mutual fault situation. However, in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the Supreme Court ruled unanimously that liability for damage in ship collision cases is to be allocated among the parties proportionately to the comparative degree of their fault, and to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

The evidence certainly substantiates the Gavrion's concession that it was at fault. The Fathom was the privileged vessel and entitled to maintain its course. It was the Gavrion's obligation at all times to stay out of the way of the Fathom, and Capt. Register, the pilot on board the Gavrion, and the man responsible for its actions, recognized this. (Tr. 69)[2] At the time when it was necessary for the Gavrion to take action to avoid the Fathom, however, the ship itself did not react appropriately to his orders. Capt. Register ordered hard port (left) and ordered the whistles sounded. The whistles did not work and were not blown until after the collision; the vessel did not respond properly. The rudder indicator showed only 15° instead of 35° as it should have. (Tr. 33–36) Capt. Register testified that had the Gavrion's rudder responded properly, the collision would have been avoided. (Tr. 40) He then gave the orders, stop engines and full astern; again the vessel did not react appropriately. The engines did not go astern until after the collision. (Tr. 36)

The record also establishes clearly that the Fathom was at fault. The International Rules for Preventing Collisions at Sea are codified in the United States Code. International Rule 29 (33 U.S.C. § 1091) requires a proper lookout at all times. Capt. Register testified that general prudent seamanship would dictate that a vessel the size of the Fathom would have a lookout while underway in the St. Johns River. (Tr. 61) Nevertheless the Fathom had no lookout whatsoever. (Ex. 6, pp. 98–99; Ex. 1, p. 52)

Batchelder and Bush both testified that the weather that morning was fair and clear and the visibility good at more than five miles. (Ex. 6, p. 32; Ex. 1, p. 60) Had the Fathom a lookout the risk of collision could have been ascertained long before the collision occurred. (33 U.S.C. § 1078) The Fathom could have taken action to avoid a collision as required by Rule 21 even of a privileged vessel. (33 U.S.C. § 1083) The Fathom was much more maneuverable than the Gavrion, and at a distance of a mile could have avoided the Gavrion if there had been a lookout to spot her. (Ex. 6, pp. 85–86) Finally, the Fathom could have indicated doubt as to the Gavrion's intentions by five rapid short whistle blasts. This is suggested, but not required, by Rule 28(b). (33 U.S.C. § 1090(b))

■ We have therefore a situation in which both vessels were at fault. Under *Reliable Transfer, supra,* we must allocate liability between the vessels proportionately to the comparative degree of their fault. We note that the Fathom was the privileged vessel and that the Gavrion put her in peril; none of this ever would have happened but for the apparent malfunction of certain of the Gavrion's controls. Nevertheless the Fathom's fault was significant: she did

---

2. During trial we reserved decision on the admissibility of Exhibit 8, Capt. Register's report to the Coast Guard concerning the collision. As a prior consistent statement of an unimpeached witness offered in evidence during the case in chief upon direct examination, it is not admissible; we have not considered it. See *United States v. Adams*, 385 F.2d 548, 549 n. 3 (2d Cir. 1967).

not have a lookout in a situation which required one, and regardless of the substantial fault of the Gavrion, the collision in all likelihood would have been avoided had a lookout been posted.

■ Accordingly, we allocate liability between the vessels in the following degrees: Gavrion 60%, Fathom 40%.

#### 4. The Seamen

The Gavrion concedes that in a mutual fault situation, as this is, it and the Fathom are each liable to the injured seamen for the full extent of their claims. The only issues before us, then, concern the extent of damages suffered by each seaman, and the contributory negligence, if any, committed by some or any of them.

The crew of the Fathom consisted of its Captain, Douglas Batchelder, and the Chief Mate, John Bush, together with five seamen. All had been examined prior to trial and their testimony was admitted by way of deposition. At his deposition each seaman read into the record a list of the estimated value of the property and personal effects he claimed lost when the vessel sank. These lists leave much to be desired,[3] but they comprise the totality of the evidence before us on this issue. The Gavrion urges that we reduce these figures by 50% on the ground that it borders on the incredible to think that they had as many personal effects as they claimed. The crew members had joined the vessel on October 5, eleven days prior to the collision; most were rescued with only the clothes on their backs. We do not find this evidence incredible; their testimony is undisputed and none of them were discredited or even seriously cross-examined as to the amount or value of the lost property. We find in accordance with their testimony that the seamen suffered property damage in the following amounts (making appropriate approximations where necessary): Batchelder

$300 (Ex. 6, p. 77); Bush $765.00 (Ex. 1, pp. 62–63); Viera $219.00 (Ex. 2, pp. 28, 38–39); Sanders $563.00 (Ex. 7, pp. 23–25); Bernard $490.00 (Ex. 3, pp. 18–19); Angus $375.00 (Ex. 5, pp. 13–15); Hinds $551.00 (Ex. 4, pp. 19–21).

None of the seamen incurred lost wages or medical expenses; none saw a doctor for personal injuries. Bush testified that none of the seamen were in fact injured. (Ex. 1, p. 60) Capt. Parker, who was on board the pilot boat which rescued the crewmembers, testified that although he specifically asked if anyone was injured or needed medical attention, he never heard any of them complain of any injuries, nor did any of them ask to see a doctor or be sent to a hospital. (Tr. 114–115) Nevertheless three seamen did testify at their deposition and without opposition that they suffered minor physical injuries: Sanders, that his neck hurt (Ex. 7, pp. 21–22); Hinds, that he had a pain in his right chest (Ex. 4, pp. 17–18); Angus, that his arm hurt him (Ex. 5, pp. 11–12).

■ We therefore find that only Sanders, Hinds and Angus suffered personal injuries and that each shall be awarded damages to the extent of $200.

The final element of the crewmembers' damages consists of the fear, shock and anguish they suffered from the collision and subsequent rescue. We note, however, that the rescue itself was orderly and controlled. Capt. Parker testified that the pilot boat was approximately five to ten feet from the bow section of the Fathom. A lighted life ring was thrown into the water; the seamen jumped into the water and were pulled by the life ring to the pilot boat. Each crewmember spent about three to five minutes in the water. (Tr. 112–120)

■ Batchelder, et al., urge that, at a minimum, they should be awarded $2,500 per man for this experience. We

---

3. For instance, Batchelder's testimony on lost personal effects in its entirety: "I lost two hundred and twenty dollars cash; a pair of shoes that cost twenty-eight dollars; and some new sheets that were on the ship, some expensive ones for a double bed, but that doesn't matter." (Ex. 6, p. 77)

find that excessive, but we also find the Gavrion's suggested figure of $25 each far too low. However controlled the rescue, the collision was nevertheless an unwarranted ordeal. We therefore award each crewmember the sum of $250.00 for his anguish, fright and suffering attendant thereon.

■ Finally, we reach the question of contributory negligence. The Gavrion urges that both Batchelder and Bush be found 100% contributorily negligent for failing to post a lookout, Viera and Sanders 25% each because they were on deck prior to the collision and should have seen the Gavrion.[4] Both Viera and Sanders, however, were occupied with their responsibilities in operating the vessel; neither was a lookout or under any duty to act as a lookout. We find that neither Viera nor Sanders was contributorily negligent.

■ The situation is different with respect to Batchelder and Bush. As Captain and Chief Mate respectively, each had the duty to post a lookout. Their failure to do so resulted, in part, in the collision. We therefore find that Batchelder and Bush were each 40% contributorily negligent; their award shall be reduced accordingly.

In accordance with the findings made above with respect to the claims of damage and contributory negligence, the total recovery herein awarded follows: Batchelder $330.00, Bush $609.00, Sanders $1,013.00, Angus $825.00, Hinds $1,001.00, Viera $469.00, Bernard $740.-00.

### 5. The Joint Venturers

This issue has caused us the most difficulty. Essentially the question before us is, do the intervening joint venturers,

Anderson, et al., have a right to proceed against the Gavrion despite the fact that Fathom Exp. has withdrawn from the case. They claim that Fathom Exp.'s cause of action against the Gavrion is an asset; that they have a maritime lien on the Fathom and that as lienholders they have a right to pursue that asset, i. e., the cause of action, even upon the withdrawal of Fathom Exp. For the reasons set forth below we find that Anderson, et al., are not lienholders and do not have standing to pursue this action against the Gavrion. Accordingly, the Gavrion's motion for judgment pursuant to Fed.R.Civ.P. 41(b) is granted.

Anderson, et al., rely on only one case in support of their position, and make no attempt to distinguish any authority cited against them. That case is *O'Brien v. Miller*, 168 U.S. 287, 18 S.Ct. 140, 42 L.Ed. 469 (1897). It involved a ship called the Johnson which was chartered to carry a cargo of nitrate of soda to Hamburg. En route the Johnson sprang a leak and had to put into port for repairs. Most of the cargo was transferred to another vessel, called for our purposes here, Vessel A, to be carried on to Hamburg. In order to pay for the repairs, the Master of the Johnson executed what was called a bottomry and respondentia bond. That was a form of loan, the security for which was the vessel and its cargo; if the vessel sank, then the loan was discharged. The Johnson, once again en route to Hamburg, collided with another vessel, "Vessel B," and sank. Vessel A, which had most of the cargo, reached Hamburg safely. The cargo interests, in order to get the cargo, had to pay off the bottomry and respondentia bond, even though incurred by the Johnson. The owners of

---

4. The Gavrion has also asserted a counterclaim against the seamen to hold them, or some of them, personally liable for damage suffered by the Gavrion as a result of the collision. No authority is cited for this proposition in the Gavrion's otherwise well-researched papers, and the proposed findings of fact and conclusions of law submitted by her do not mention it. This is not a case involving a compulsory pilot who may be held personally responsible. See *Homer Ramsdall Transp. Co. v. Compagnie Generale Transatlantique*, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901); Gilmore & Black, *Law of Admiralty* §§ 7–6, 7–16 (1975). At the very least, the Gavrion has failed to meet its burden of proof. The counterclaim is dismissed.

the Johnson subsequently sued Vessel B for the loss of the Johnson and prevailed; Vessel B was found wholly at fault for the collision. The cargo interests then sued the owners of the Johnson to recover the sums that had been paid the holder of the bond and recovered. The Supreme Court held, *inter alia,* that the loss of the Johnson did not, under those circumstances, discharge the bond; the cargo interests were therefore allowed to pursue their claims. In essence the Court held merely that the owners of the Johnson were liable to the cargo interests who had paid off the bond, since by so doing the cargo interests had become a creditor of the Johnson owners.

*O'Brien,* in turn, relied heavily on *Sheppard v. Taylor,* 30 U.S. (5 Pet.) 675, 8 L.Ed. 269 (1831). *Sheppard,* however, simply stands for the proposition that seamen and officers have a maritime lien on their vessel for their wages. That, however, is an ancient right of mariners. See Gilmore & Black, *supra* at § 9–20. The question before us is whether Anderson, et al., have such a maritime lien on the Fathom. We hold that they do not.

■ In the first place we have grave doubts that a maritime lien can survive the total destruction of the vessel. See *Walsh v. Tadlock,* 104 F.2d 131, 132 (9th Cir. 1939), *cert. denied,* 308 U. S. 584, 60 S.Ct. 107, 84 L.Ed. 489 (1939). Assuming, however, that a maritime lien can survive the destruction of its vessel, nevertheless any *in rem* claim against a vessel must be perfected. It is uncontroverted here that no process *in rem* was ever issued against the Fathom. "Attachment subjecting the res to the jurisdiction of the court is a prerequisite to a finding of *in rem* liability." *Dow Chemical Co. v. Barge UM–23B,* 424 F.2d 307, 311 (5th Cir. 1970); *Johnson v. Oil Transport Co.,* 440 F.2d 109, 115 n. 6 (5th Cir.), *cert. denied,* 404 U.S. 868, 92 S.Ct. 109, 30 L.Ed.2d 111 (1971); *Associated Met-*

*als & Minerals v. S.S. Portoria,* 484 F.2d 460, 461–462 (5th Cir. 1973).

■ Finally, Anderson, et al., have no valid maritime lien on the Fathom, though they claim one. They were not seamen or any other sort of employee; they were joint venturers sharing in responsibility. They did not work for wages, but rather looked to a share in the profits of the expedition as a return on their investment.

The facts alleged as the basis of their complaint are that when the joint venturers arrived at the Fathom they discovered that it was not fit for the proposed expedition. All of them worked on the vessel to prepare it for sea; it then left without them, taking along the personal effects of some of them. None of the joint venturers ever got their money back; only some of their effects were returned.

Count One of the complaint alleges that each intervenor was a joint venturer, that each has a maritime lien, incorporates a contract between Fathom Exp. and one of the joint venturers (Ex. B) and seeks an accounting for, and payment of, sums due them pursuant to the joint venture. *Economu v. Bates,* 222 F.Supp. 988 (S.D.N.Y.1963), involved the dismissal of a complaint seeking an accounting of profits in an allegedly maritime transaction. In so ruling, Judge Weinfeld stated,

> Since the underlying transaction sued upon is one of joint venture or partnership and the principal relief sought is an accounting of profits arising out of the enterprise, it is not maritime and is beyond the admiralty jurisdiction. It has long been the law, as stated by Judge L. Hand, "that a court of admiralty will not entertain a suit for an accounting as such: as, for example, an accounting between co-owners of a vessel, or between maritime adventurers, or between principal and agents, and so on." . . .

*Id.* at 991. See also *The Odysseus III,* 77 F.Supp. 297 (S.D.Fla.1948). We find

therefore that Anderson, et al., do not have a maritime lien based on Count One.

In Count Two Anderson, et al., seek $1500 each as the reasonable value of the work and services performed in repairing and outfitting the Fathom to prepare it for sea. They claim a lien upon the vessel and allege that such work was not performed pursuant to the contract.

We find, however, that the contract (Ex. B) executed prior to any work, does control. On its first page it states that the "Venturers are desirous of joining with Fathom in making said expedition, undertaking financing of said expedition and providing labor required for said expedition." And on page three it states that the joint venturers "shall have no interest whatsoever in said equipment." When examined both in its particulars and in its entirety, the contract clearly contemplates the performance of work and labor by the joint venturers in order to make the expedition a success.

Anderson, et al., were neither seamen nor shipyard workers—they conceded as much at trial (Tr. 97); plainly, they were joint venturers. And joint venturers are not entitled to a maritime lien for furnishing supplies, repairs or labor. In *P. T. Perusahaan Pelay. Sam. Trikora L. v. T. S. Salzachtal*, 373 F. Supp. 267 (E.D.N.Y.1974), Judge Bartels stated the prevailing rule:

> . . . the Courts have held that a part owner or a joint venturer with the owner, or a charterer who acts as general agent of the owner has no such lien upon the theory that such persons are not strangers to the vessel who have relied on the security of the ship but have rather relied on the credit of the owner . . .

*Id.* at 275.

Count Three alleges conversion of the $3,000 each which the joint venturers contributed as capital for the expedition. First, we must recognize the maritime policy discouraging the classification of claims as liens. As Justice Grier stated,

> this privilege or lien, though adhering to the vessel, is a secret one; it may operate to the prejudice of general creditors and purchasers without notice; it is therefore 'stricti juris', and cannot be extended by construction, analogy, or inference.

*The Yankee Blade*, 60 U.S. (19 How.) 82 89, 15 L.Ed. 554 (1857). This policy is modern as well as traditional. In *In re Admiralty Lines, Ltd.*, 280 F.Supp. 601 (E.D.La.1968), *aff'd per curiam*, 410 F. 2d 398 (5th Cir. 1969), the court said that "admiralty law has long ago ceased to create new liens. The only liens recognized today are those created by statute and those historically recognized in maritime law." 280 F.Supp. at 604–605. See also *Nadle v. M/V Tequila*, 1973 A. M.C. 909, 913 (S.D.N.Y.1973) (Gurfein, J.): "It is not for the Court to create new species of maritime liens where precedent gives no such command."

Secondly, we note that the property allegedly converted, money, is not considered maritime in nature. In *American Hawaiian Ventures, Inc. v. M. V. J. Latuharhary*, 1966 A.M.C. 1363 (D.N.J.1966), the court held that there was no admiralty jurisdiction because the cause of action was based upon the alleged conversion of non-maritime property.

Since *Executive Jet Aviation v. Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L. Ed.2d 454 (1972), the standard for determination of maritime tort jurisdiction has been that maritime locality alone is no longer sufficient, and that the wrong must bear a significant relationship to maritime activity. See *Kelly v. Smith*, 485 F.2d 520, 524 (5th Cir. 1973). The alleged conversion here cannot be said to bear a significant relationship to maritime activity. The money converted was capital contributed by each of the intervenors to finance the venture; it was allegedly not returned by Fathom Exp. This was primarily a highly speculative

**398**

business venture; admiralty jurisdiction is, and properly should not be, invoked and made available to support it.

Counts Four, alleging conversion of personal effects, and Five, alleging breach of contract, do *not* allege maritime liens. Even if they did, however, such claims would fall for the same reasons and on the same authorities cited above.

Accordingly, for all these reasons, we are constrained to, and do, hold that Anderson, et al., have no standing to pursue this claim. Because of this and the withdrawal by Fathom Exp. and Associates Capital from the litigation, we grant the Gavrion's motion to dismiss under Rule 41(b). Our decision on this issue does not affect, however, our findings above with respect to the relative fault of the two vessels and the damages and contributory negligence of the seamen, Batchelder, et al.

This opinion shall constitute our findings of fact and conclusions of law pursuant to Rule 52.

So ordered.