**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CROWLEY MARINE SERVICES INC., a
Delaware corporation,
                    *Plaintiff-Appellant,*

          v.

MARITRANS INC., a Delaware
corporation; MARITRANS
TRANSPORTATION INC., a Delaware
corporation; MARITRANS OPERATING
COMPANY LP, a Delaware limited
partnership; MARITRANS GENERAL
PARTNER INC., a Delaware
corporation,
                    *Defendants-Appellees.*

No. 07-35237

D.C. No.
CV-02-02487-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
February 4, 2008—Seattle, Washington

Filed July 3, 2008

Before: Raymond C. Fisher, Ronald M. Gould, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Gould

**COUNSEL**

Daniel J. Gunter, Riddell Williams P.S., Seattle, Washington, for the plaintiff-appellant.

Marc E. Warner, LeGros, Buchanan & Paul, Seattle, Washington, for the defendants-appellees.

**OPINION**

GOULD, Circuit Judge:

Crowley Marine Services, Inc. ("Crowley") appeals the district court's reallocation of fault in Crowley's action against Maritrans, Inc., Maritrans Transportation Inc., Maritrans Operating Company, and Maritrans General Partner Inc. ("Maritrans") arising out of the collision of Crowley's tug boat, the Sea King, with Maritrans' oil tanker, the Allegiance. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

**I**

Another panel of our court previously heard an appeal in this case, and we present the facts as detailed in our prior opinion here:

> Crowley provides vessel escort and assistance services in Puget Sound. Federal law requires that any tanker transiting Puget Sound east of navigational Buoy "R" with oil cargo must be escorted by two vessels. Maritrans hired Crowley to provide escort services for the Allegiance, an oil tanker under the command of Captain Joseph Semler, on the evening of January 19, 2002. Crowley provided two tug boats: the Sea King, under the command of Captain Donald Nekeferoff, and the Chief, under the command of Captain William Lowery.

At 8:50 p.m., the three captains held a radio conference to plan the escort. According to the agreed-upon plan, the Allegiance would travel east towards Buoy R at a speed of about 15 knots. While the Allegiance was still two to three miles away, the two tugs would depart from Buoy R at about 12.5 knots. The Allegiance would gradually overtake the two tugs and pass between them, at which point the tugs would take up position on either side of the tanker to complete the escort maneuver, with the Chief tethered to the stern and the Sea King on the tanker's port shoulder.

For approximately the first forty-five minutes, the maneuver went according to plan. Each of the three vessels sailed with auto-pilot set to 58 degrees true, with the Allegiance gradually overtaking the tug boats. During this time both the Allegiance and the Chief made numerous adjustments to their course to account for the fact that the vessel's auto-pilot function maintains a ship's heading (the direction in which the bow points) but does not reflect changes due to wind or currents. The Sea King made no comparable adjustments to its course.

By 9:35 p.m., with the Sea King still a short distance ahead, the pilot and helmsman aboard the Allegiance realized that the tug boat was also closing the lateral distance between the vessels. Nonetheless, both men testified that they had seen escort tugs running close alongside tankers many times before, and saw no cause for alarm. As the Sea King came closer and closer, Captain Semler aboard the Allegiance decided that the vessels' proximity exceeded his comfort zone. Although later testifying that he did not see any risk of collision, Captain Semler radioed Captain Nekeferoff aboard the Sea King, inquiring,

"Don, are you ok?" Captain Nekeferoff responded affirmatively.

Shortly after the radio communication, the Allegiance and the Sea King collided, with the tug boat pushed along by the tanker's bow and nearly capsizing as she rolled to the tanker's starboard side while heeling to port. About halfway down the tanker's side, the Sea King righted itself as the tanker sailed past. The exact dynamics of the collision were disputed. Crowley presented expert testimony that the two vessels gradually converged until the Allegiance struck the Sea King almost directly from behind. Maritrans presented testimony that the Sea King veered suddenly to starboard, into the path of the Allegiance.

At trial, each side attributed fault entirely to the other, relying in large part on the COLREGS.[1] The COLREGS provide a "universal system of sea traffic rules" applicable to vessels in international waters. William Tetley, International Maritime and Admiralty Law 237 (2002). Originally adopted by treaty under the auspices of the International Maritime Organization in 1972, the COLREGS have since been incorporated into the national law of "every shipping nation in the world." *Id.* These rules apply to "all vessels upon the high seas and in all waters connected therewith navigable by seagoing vessels." Rule 1(a).

Crowley argued that Maritrans violated four provisions of the COLREGS: Rule 5, which establishes a duty to maintain a lookout; Rule 8, which estab-

---

[1]The International Regulations for Preventing Collisions at Sea, Oct. 20, 1972, T.I.A.S. No. 8587, 28 U.S.T. 3459, are better known by the acronym COLREGS.

lishes a duty to avoid collision; Rule 13, which makes an overtaking vessel responsible for avoiding collision; and Rule 34, which requires vessels in sight of each other to give a signal when changing course. Maritrans countered that Crowley violated Rule 5 by failing to maintain a proper lookout. Maritrans also maintained that Crowley reasonably should have investigated the risks stemming from Captain Nekeferoff's history of alcoholism and health problems, conditions that appeared to be related to a temporary loss of situational awareness shortly before and during the collision.

The district court credited Maritrans' arguments, finding that because the two vessels were operating according to agreed maneuvers, Rules 8 and 13 of the COLREGS did not apply. To reach this decision, the district court invoked Rule 2, which provides that "[i]n construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger." Rule 2(b).

Although noting that the plain language of the special circumstances exception in Rule 2 did not provide such an exception on its face, the district court found that "courts have either expanded the scope of Rule 2(b)'s special circumstances or have created a wholly separate category of special circumstances involving vessels operating in concert and pursuant to agreed maneuvers." Thus freed from the restrictions of Rule 8 and Rule 13, which would have focused on Maritrans' fault for failing to avoid the Sea King, the district court found Maritrans to be only 25% responsible for the accident.

*Crowley Marine Servs. Inc. v. Maritrans Inc.*, 447 F.3d 719, 722-23 (9th Cir. 2006) [hereinafter *Crowley I*] (footnote added).

In *Crowley I*, we reversed the district court's fault determination and remanded, concluding that, pursuant to Rule 13(a), the Allegiance, as the overtaking vessel, had a duty to keep out of the way of the Sea King and that, pursuant to Rule 8(e), Captain Semler should have reduced the speed of the Allegiance to avoid collision with the Sea King. *Id.* at 724. We also concluded that the fact that the Allegiance and the Sea King were operating in concert and pursuant to agreed maneuvers did not constitute a special circumstance that permitted departure from the COLREGS under Rule 2(b).[2] *Id.* at 727. We remanded to the district court for a reassessment of comparative fault in light of our ruling, urging the district court to base its reassessment on "the pre-arranged escort plan, along with all the other facts." *Id.* at 728. In a memorandum disposition filed simultaneously with the *Crowley I* opinion, we held that "Crowley knew or reasonably should have known of Captain Nekeferoff's serious medical and alcohol problems," and therefore "had a duty to conduct a further inquiry before allowing Nekeferoff to captain" the Sea King. *Crowley Marine Services Inc. v. Maritrans Inc.*, 179 Fed. App. 415, 417 (9th. Cir. 2006) [hereinafter *Crowley IA*]. As such, we concluded that the district court did not abuse its discretion by admitting evidence regarding Captain Nekeferoff's medical and alcohol problems. *Id.* We also determined that the district court did not abuse its discretion by admitting the testimony of Maritrans' expert on hydrodynamics. *Id.*

On remand, the district court considered all of the facts of

---

[2]COLREGS Rule 2(b) provides that "[i]n construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger."

the case, including Maritrans' violations of Rules 8(e) and 13(a), Crowley's violations of Rules 5 and 17(b), and several other factors, and reallocated fault by increasing Maritrans' responsibility for the collision to 30% and decreasing Crowley's responsibility to 70%.

## II

In its second appeal, Crowley again challenges the district court's comparative fault assessment. We review de novo an admiralty court's conclusions of law, *Fireman's Fund Ins. Cos. v. Big Blue Fisheries, Inc.*, 143 F.3d 1172, 1175 (9th Cir. 1998), and review for clear error an admiralty court's findings of fact, *Madeja v. Olympic Packers, LLC*, 310 F.3d 628, 635 (9th Cir. 2002). We also review for clear error an admiralty court's apportionment of fault. *Alkmeon Naviera, S.A. v. M/V Marina L*, 633 F.2d 789, 796 (9th Cir. 1980).

## III

Crowley first argues that the district court erred by not assigning the majority of fault for the collision to Maritrans, and urges us to adopt a rule of law that requires a district court to allocate the majority of fault to the overtaking vessel where the overtaking vessel has violated Rule 13(a)[3] and that violation is a cause of the collision under the rule of *The Pennsylvania*, 86 U.S. 125 (1873).[4] Because the Supreme

---

[3]COLREGS Rule 13(a) provides that "any vessel overtaking any other shall keep out of the way of the vessel being overtaken."

[4]The rule of *The Pennsylvania* provides that when a vessel violates a statutory rule intended to prevent collision, "the burden rests upon [that vessel] of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute." 86 U.S. at 136. This *Pennsylvania*-presumption goes only to *causation* and has no bearing on the district court's determination of *liability*. *See, e.g.*, *Fireman's Fund*, 143 F.3d at 1176 n.4; *Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 825 n.5 (9th Cir. 1988); *Crown Zellerbach Corp. v. Willamette-Western Corp.*, 519 F.2d 1327, 1329 (9th Cir. 1975).

Court, in its seminal decision in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397 (1975), adopted the comparative fault rule for assessing fault in maritime collisions, we reject Crowley's argument and affirm the district court's allocation of fault.

**[1]** Before the Supreme Court's decision in *Reliable Transfer*, maritime law called for the equal division of damages in all maritime collisions "whenever both parties [were] found to be guilty of contributing fault, whatever the relative degree of their fault may have been." 421 U.S. at 397. The genesis of that rule has been traced back to the twelfth century, to a divided damages maritime rule found in Article XIV of the Laws of Oleron. *See id.* at 402 n.3; *see also The Laws of Oleron*, art. XIV, reprinted in 30 F. Cas. 1171, 1178 (1897) (appendix).[5] In *Reliable Transfer*, however, the Supreme

---

[5]The Laws of Oleron were compiled by Eleanor, Duchess of Guienne. 30 F. Cas. at 1171. While participating in the Crusades and traveling in the eastern Mediterranean, she observed the maritime conventions that were developing there. *Id.* She successfully introduced those conventions to her own lands on the island of Oleron. *Id.* Eleanor's son, Richard I of England, introduced an improved version of the Laws of Oleron to England. *Id.* Today, they are considered the foundation of European maritime codes. *See* 1 S. FRIEDELL, BENEDICT ON ADMIRALTY § 6, at 21 (rev. 7th ed. 2007). Article XIV of the Laws of Oleron established the equal division of damages rule:

> If a vessel, being moored, lying at anchor, be struck or grappled with another vessel under sail, that is not very well steered, whereby the vessel at anchor is prejudiced, as also wines, or other merchandize in each of the said ships damnified. In this case the whole damage shall be in common, and be equally divided and appraised half by half . . . . The reason why this judgment was first given, being, that an old decayed vessel might not purposely be put in the way of a better, which will the rather be prevented when they know that the damage must be divided.

30 F. Cas. at 1178. A form of this divided damages rule was adopted by the United States Supreme Court in *The Catharine*, 58 U.S. 170, 177-78 (1854), and became a part of American maritime law until replaced by the comparative fault rule established in 1975 by the Supreme Court's decision in *Reliable Transfer*, 421 U.S. at 411, which overruled *The Catharine*.

Court replaced this long standing equally-divided damages rule with the comparative fault rule, which allocates damages in proportion to each vessel's share of the blame. 421 U.S. at 411. Underlying this decision was the assumption that "[a] rule that divides damages by degree of fault would seem better designed to induce care than the rule of equally divided damages, because it imposes the strongest deterrent upon the wrongful behavior that is most likely to harm others." *Id.* at 405 n.11. In applying the rule of *Reliable Transfer*, we have emphasized the importance of the flexibility and adaptability of the comparative fault standard. *See, e.g.*, *Crowley I*, 447 F.3d at 728 & n.7. Comparative fault requires a district court to undertake an individualized evaluation of each collision and to consider and compare the "fault" of each party, where "fault" is defined as "blameworthy conduct which contributes to the proximate cause of the loss or injury." *Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129, 1139 (9th Cir. 1977).

**[2]** Crowley effectively asks us to abandon the comparative fault rule in situations where an overtaking vessel has violated Rule 13(a) and that violation is a cause of the collision, and instead adopt a rule that the overtaking vessel in such a situation is always responsible for the majority of fault as a matter of law. Crowley's proposed rule, however, would mandate that a vessel charged with violating Rule 13(a) would bear the majority of the burden for a collision even if the balance of factors showed that the other vessel was more blameworthy, because of either its own statutory violations or other negligent behavior. *Cf. Crowley I*, 447 F.3d at 728 (citing *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991), for the proposition that "an assessment of comparative fault must be based on all the facts of the case, not on a simple count of how many rules of navigation each vessel has violated"); *Trinidad*, 845 F.2d at 825 n.5 (recognizing that a vessel that has not violated the COLREGS may be more blameworthy than a vessel that has committed a statutory violation). We decline to adopt Crowley's proposed rule

because it would contravene the purpose of the comparative fault standard established in *Reliable Transfer*—namely, to allocate fault according to the blameworthiness of each party —particularly in cases, like this one, where the district court determines that the conduct of the party not in violation of Rule 13(a) was the primary cause of the collision.

Our holding today is bolstered by the numerous cases Crowley cites in support of its proposed majority fault rule. In each case, the district court did not assign the overtaking vessel the majority of fault merely because it had violated Rule 13(a) and that violation was a cause of the collision, but instead determined based on an examination of all of the facts of the case that the overtaking vessel was the more blameworthy party. *See, e.g.*, *In re Nat'l Shipping Co. of Saudi Arabia*, 147 F. Supp. 2d 425, 440 (E.D. Va. 2000) (assigning majority of fault to vessel because it was the burdened vessel *and* because, unlike the other vessel, it was fully aware of the circumstances giving rise to the collision); *In re Seiriki Kisen Kaisha*, 629 F. Supp. 1374, 1382 (S.D.N.Y. 1986) (assigning 60% of fault to burdened vessel because it was the give-way vessel *and*, "most importantly," because it took a last-minute turn into the course line of the other vessel); *Empressa Hondurena de Vapores, S.A. v. Bank Line Ltd.*, 434 F. Supp. 602, 608 (S.D.N.Y. 1977) (assigning 70% of fault for collision to burdened vessel primarily because of its excessive speed and because of its failure to have an adequate number of lookouts posted); *Fathom Expeditions, Inc. v. M/T Gavrion*, 402 F. Supp. 390, 393-94 (M.D. Fla. 1975) (assigning 60% of fault for collision to vessel because it was the burdened vessel *and* because the collision could have been avoided had the vessel's whistle, rudder, and engine responded properly). Crowley's proposed rule would wrest from the trial judge the responsibility of weighing the culpability of each party, which would run counter to both the comparative fault rule established in *Reliable Transfer* and our long-standing determination that the trial judge can best assess fault. *See Alkmeon Naviera*, 633 F.2d at 796.

**[3]** We are sensitive to the concern that the "rules of the road" on the high seas must be clear, lest we create too much uncertainty in an area that requires a high degree of clarity. Our decision not to adopt Crowley's proposed rule, therefore, should not encourage vessels to alter their understanding of the right-of-way; rather, we only reiterate that all ships must exercise requisite caution regardless of their statutory status. The unusual facts of this case, including the coordinated maneuvers of the two vessels, Captain Nekeferoff's serious medical and alcohol problems, and Crowley's knowledge of these problems, present what we presume will be, and what prior cases indicate is, a rare case in which the overtaking vessel is not responsible for the majority of fault. It is precisely because of facts like those presented in this case that we do not adopt Crowley's proposed rule, and instead keep to the course of the flexible standard of comparative fault, deferring to the district court's assessment of fault unless it is clearly erroneous.

## IV

**[4]** Crowley also contends that the district court erred in allocating fault to the Sea King for not following the mandates of Rules 17(a)(ii) and 17(b) by not taking action to avoid the collision. Crowley challenges the district court's determination, arguing instead that under Rule 17(a)(i) the Sea King, as the vessel being overtaken, was required to keep, and did in fact keep, her course and speed.[6] Crowley relies on

---

[6]COLREGS Rule 17 provides, in pertinent part:

(a)

    (i)   Where one of two vessels is to keep out of the way the other shall keep her course and speed.

    (ii)   The latter vessel may however take action to avoid collision by her manoeuvre alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

(b)   When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be (avoided by the action of the give-way vessel alone, she shall take such actions as will best aid to avoid collision.

cases from the Second and Fifth circuits to support its argument, but we conclude that the decisions of our sister circuits are inapposite to the case before us and hold that the district court did not err in allocating fault to Crowley for the Sea King's failure to abide by Rule 17(b)'s mandate to take action to avoid the collision.

Crowley contends that the Second Circuit's decision in *Potomac Transport, Inc. v. Ogden Marine, Inc.*, 909 F.2d 42 (2d Cir. 1990), supports its argument that had the Sea King, as the overtaken vessel, taken action to avoid the collision, it would have been in violation of Rule 17(a)(i) which requires that the overtaken vessel keep its course. However, the Second Circuit found the overtaken vessel in *Potomac* primarily at fault not merely because it altered its course to avoid the collision, but also because the second mate of the vessel made the decision after only two "cursory visual observations" of the overtaking vessel, failed to inform the overtaking vessel of the planned movements, and was "entirely negligent" in the maneuvers he undertook to avoid a collision, moving the vessel toward the overtaking vessel instead of away from it. *Id.* at 45. In other words, *Potomac* held that the overtaken vessel was primarily responsible for the collision because "even if it had been necessary for [the overtaken vessel] to shift her own course to avoid [the overtaking vessel]," she would still be liable because she negligently pursued these maneuvers. *Id.* The *Potomac* decision does not compel the conclusion that Rule 17(b) never requires the overtaken vessel to give way, and is distinguishable from the present case where Captain Nekeferoff failed to take any action to avoid the collision.

Crowley's reliance on the Fifth Circuit's *Ellis* decision is similarly unpersuasive. The Fifth Circuit determined that the overtaken and eventually sunk tug in *Ellis* was not mutually at fault where it failed to take action to avoid the close passage of the overtaking oil tanker. 292 F.2d at 95-96. Yet, the precise question presented in *Ellis* was whether the overtaking vessel's failure to maintain a lookout necessitated that it share

some of the liability for the ensuing accident and not whether its failure to abide by Rule 17(b) required the same. *See id.* Moreover, although *Ellis* noted that the "only condition imposed" on the overtaken vessel at bar was "that she hold course and speed," it acknowledged that under different circumstances, an overtaken vessel may be liable for failing to maintain a lookout when it would have enabled the vessel "to have seen that [the overtaking vessel's] violations were so patent and so far advanced that unless the [overtaken vessel] affirmatively took evasive action, serious harm would be done." *Id.* In contrast, here the district court determined that the Sea King violated Rule 5 of the COLREGS by not having a proper lookout at all times, and that this violation was a cause of the collision under the rule of *The Pennsylvania*. Because the Sea King was involved in a coordinated maneuver with the Allegiance, escorting the Allegiance through the Puget Sound, the district court did not err in concluding that the Sea King's violation of Rule 5 was a cause of the collision. If the Sea King had kept a lookout astern, it could have taken action to avoid the collision with the Allegiance, and should have done so pursuant to Rule 17(b).

**[5]** Like the other rules of the COLREGS that employ the word "shall," Rule 17(b) is mandatory. Rule 17(b) mandates that the overtaken vessel, when she "finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, . . *shall* take such actions as will best aid to avoid collision." Rule 17(b) (emphasis added). This interpretation of the word "shall" is consistent with our earlier opinion in *Crowley I*, that the Allegiance, as the overtaking vessel, despite the coordinated nature of the tug escort, was required to abide by the compulsory COLREGS Rules 8(e) and 13(a), which also use the term "shall." *See Crowley I*, 447 F.3d at 724-27. We conclude that Rule 17(b) is a mandatory COLREGS rule that requires the overtaken vessel to take action when "both vessels enter extremis" and "action by both vessels is necessary if the collision is to be avoided." *Nat'l Shipping Co. of Saudi Arabia*, 147 F. Supp. 2d at 439. Here, the

Sea King's trajectory eventually placed her in an "extremis" position where an accident could have been avoided only by her own action. Captain Nekeferoff's last-minute maneuvers were ineffective and too late to avert the collision. *Cf. Empressa*, 434 F. Supp. at 607-08. We hold that the district court did not err in determining that the Sea King violated Rule 17(b) by not taking action to avoid collision with the Allegiance.

**V**

**[6]** In conclusion, we hold that the district court did not err in apportioning 70% of the responsibility for the collision to the Sea King. As we previously held, the district court did not err in determining that Crowley knew or reasonably should have known of Captain Nekeferoff's serious medical and alcohol problems. *Crowley IA*, 179 Fed. App. at 417. Nor did the district court err in considering the coordinated nature of the tug escort, the Sea King's violations of Rules 5 and 17(b), or the negligence of both Crowley and Captain Nekeferoff. *See Crowley I*, 447 F. 3d at 728. Given all of the facts surrounding this collision, including the Allegiance's violation of Rules 8(e) and 13(a), it was not clear error for the district court to assess 70% of the fault to the Sea King. The district court carefully and conscientiously considered the facts and made a fault allocation consistent with the rule of *Reliable Transfer*, and it is precisely this type of fact-intensive decision that is committed by our precedent to the district court for its determination. Absent clear error, we will not disturb a district court's factual determination on fault allocation for a collision at sea.

**AFFIRMED.**