**22-1765-cv (L)**
*In the Matter of Energetic Tank, Inc.*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM 2023

ARGUED: JANUARY 18, 2024
DECIDED: JULY 26, 2024

Nos. 22-1765, 22-2774, 22-2871,
22-2883

## IN THE MATTER OF ENERGETIC TANK, INC.

ENERGETIC TANK, INC., *as Owner of the M/V ALNIC MC, for
Exoneration from or Limitation of Liability,
Plaintiff–Counter-Defendant–Appellant–Cross-Appellee,*

*v.*

UNITED STATES OF AMERICA,
*Claimant–Counter-Claimant–Counter-Defendant–Appellee,*

UNKNOWN DEFENDANT,
*Defendant–Counter-Defendant–Appellee,*

NAVIN RAMDHUN,
*Defendant–Counter-Claimant–Appellee,*

MARK JOSEPH LIGON, MALACHI SHANNON,
*Claimants–Counter-Claimants–Counter-Defendants–Appellees,*

ANDY ACERET, MICHAEL WUEST, JOSHUA PATAT, ASHANTI MOLTON, DONNOVAN LAMARCUS JONES, AYAKA JOSEPH, XIOMARO CUEVAS SOTO, DEVIN MASK, PATRICK JOSEPH, HARUKA RAMDHUN, CHEYSSERR LUANGCO, CARMELO CASTRO, PHILIP TORIO, PHILLIP FIELDS, JAMES ANDY WOODS, JOHN B. RAY, RODRIGO OWEN TIONQUIAO, JERRELL DEAN, CLEMBER MIRANDA, MICHAEL COLLINS, DEDRICK WALKER, MILTON O. LOVELACE, DAVION REESE, JUAN ROMERO, AKIMWALLE WINTER, VARES BELONY, TRACEY LOVELACE, DELANDO BECKFORD, VICTOR GRANADOS, BYRON JAMAL JOHNSON,
*Counter-Claimants–Claimants–Appellees–Cross-Appellants,*

GILLEON GILLIS, JOHN HOAGLAND, KAREN DOYON, RICHARD LOPEZ, TAYLOR TROY, KAREN BUSHELL, RACHEL ECKELS, THERESA PALMER, DARRYL SMITH, AMY WINTERS, JACQUELINE INGRAM, GAO YONG, DONNEL ROBINSON, MR. DOYLE A EBARB, JOSHUA BRUCE HOOK, JASON LUANGCO, FRANCESCO SANFILIPPO, ALEXIS SANFILIPPO, NESTOR CUEVAS SOTO, JOSEPH K ROBBINS,
*Counter-Claimants–Claimants–Appellees,*

KERRINGTON HARVEY, JASON BALDWIN, BRANDON YORK,
*Claimants–Appellees–Cross-Appellants,*

MATTHEW MONTGOMERY, JENNIFER SIMON, KAREN TOLLEY, *as personal representative of the Estate of Brandon Tolley*,
*Claimants–Appellees,*

BRANDON TOLLEY,
*Claimant*.*

Appeal from the United States District Court
for the Southern District of New York

————

---

* The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

Before:  WALKER, CARNEY, and PARK, *Circuit Judges*.

————

Before dawn on August 21, 2017 in the Singapore Strait, the M/V ALNIC ("ALNIC"), a Liberian-flagged oil-and-chemical tanker, collided with the U.S.S. JOHN S. MCCAIN ("MCCAIN"), a Navy destroyer.  Ten Navy sailors died and dozens more were injured.  Both vessels, and especially MCCAIN, sustained significant damage.

ALNIC's owner, Energetic Tank, Inc. ("Energetic"), petitioned for exoneration from or limitation of liability for the collision.  Forty-one Navy sailors or their representatives ("the Sailor-Claimants") filed claims for damages against Energetic.  So did the United States, against which Energetic filed a counterclaim.  Subsequently, Energetic and the United States agreed upon the monetary value of the damages to ALNIC and to MCCAIN as $442,445 and $185 million, respectively.

First, the district court (Crotty, *J.*) concluded that Singapore law would govern both the determination of liability and the calculation of the Sailor-Claimants' damages.  Then, after a Phase 1 bench trial concerning only liability, the district court denied Energetic's petition for exoneration from or limitation of liability.  It allocated fault for the collision: 80% to the United States and 20% to Energetic.  Based on the 20% of damages apportioned to Energetic, the claim of the United States against Energetic is $36,646,044, plus interest.  The district court then indicated that it would proceed to a Phase 2 trial, to determine damages to the Sailor-Claimants.  Energetic appealed.

While the appeal was pending, the district court dismissed Energetic's claims for contribution or indemnity against the United States for any damages that might be awarded to the Sailor-Claimants during the Phase 2 trial as barred by sovereign immunity.  Energetic

also appealed this order.

Following its decision on sovereign immunity, the district court retroactively certified that its earlier opinion on the apportionment of liability was a final judgment as to the United States. Subsequently, several Sailor-Claimants cross-appealed, challenging the district court's earlier decision applying Singapore law to the calculation of damages. We consolidated the various appeals.

We find no error in either the district court's apportionment of liability under Singapore law or its sovereign immunity ruling. We therefore AFFIRM the district court's judgment and order on Energetic's appeals. The district court's choice-of-law ruling, however, is a non-appealable collateral order. We accordingly DISMISS the Sailor-Claimants' cross-appeals for lack of jurisdiction.

————

DAVID J. WEINER, Arnold & Porter Kaye Scholer LLP, Washington, DC (Stephen K. Wirth, Arnold & Porter Kaye Scholer LLP, Washington, DC; Thomas H. Belknap, Jr., Alan M. Weigel, Blank Rome LLP, New York, NY, *on the brief*), *for Plaintiff–Counter-Defendant–Appellant–Cross-Appellee Energetic Tank, Inc.*

ANNE MURPHY, U.S. Department of Justice, Washington, DC (Brian M. Boynton, Stephen Flynn, Jessica Sullivan, Kyle Fralick, Thomas M. Brown, *on the brief*), *for Claimant–Counter-Claimant–Counter-Defendant–Appellee United States of America.*

PAUL T. HOFMANN, Hofmann & Schweitzer, New York, NY (Dario A. Chinigo, *on the brief*), *for Counter-Claimants–Claimants–Appellees–Cross-*

*Appellants Andy Aceret, et al. and Claimants–Appellees–Cross-Appellants Kerrington Harvey, et al.*

Jacob Shisha, Tabak Mellusi & Shisha LLP, New York, NY, *for Counter-Claimants–Claimants–Appellees* Joshua Bruce Hook, et al.

Roy C. Dripps, Michael T. Blotevogel, Armbruster Dripps Blotevogel, LLC, Maryville, IL, *for Counter-Claimants–Claimants–Appellees* Francesco & Alexis Sanfilippo

————

JOHN M. WALKER, JR., *Circuit Judge*:

Before dawn on August 21, 2017 in the Singapore Strait, the M/V ALNIC ("ALNIC"), a Liberian-flagged oil-and-chemical tanker, collided with the U.S.S. JOHN S. MCCAIN ("MCCAIN"), a Navy destroyer. Ten Navy sailors died and dozens more were injured. Both vessels, and especially MCCAIN, sustained significant damage.

ALNIC's owner, Energetic Tank, Inc. ("Energetic"), petitioned for exoneration from or limitation of liability for the collision. Forty-one Navy sailors or their representatives ("the Sailor-Claimants") filed claims for damages against Energetic. So did the United States, against which Energetic filed a counterclaim. Subsequently, Energetic and the United States agreed upon the monetary value of the damages to ALNIC and to MCCAIN as $442,445 and $185 million, respectively.

First, the district court (Crotty, *J.*) concluded that Singapore law would govern both the determination of liability and the calculation of the Sailor-Claimants' damages. Then, after a Phase 1 bench trial concerning only liability, the district court denied Energetic's petition for exoneration from or limitation of liability. It allocated fault for the

collision: 80% to the United States and 20% to Energetic. Based on the 20% of damages apportioned to Energetic, the claim of the United States against Energetic is $36,646,044, plus interest. The district court then indicated that it would proceed to a Phase 2 trial, to determine damages to the Sailor-Claimants. Energetic appealed.

While the appeal was pending, the district court dismissed Energetic's claims for contribution or indemnity against the United States for any damages that might be awarded to the Sailor-Claimants during the Phase 2 trial as barred by sovereign immunity. Energetic also appealed this order.

Following its decision on sovereign immunity, the district court retroactively certified that its earlier opinion on the apportionment of liability was a final judgment as to the United States. Subsequently, several Sailor-Claimants cross-appealed, challenging the district court's earlier decision applying Singapore law to the calculation of damages. We consolidated the various appeals.

We find no error in either the district court's apportionment of liability under Singapore law or its sovereign immunity ruling. We therefore AFFIRM the district court's judgment and order on Energetic's appeals. The district court's choice-of-law ruling, however, is a non-appealable collateral order. We accordingly DISMISS the Sailor-Claimants' cross-appeals for lack of jurisdiction.

BACKGROUND[2]

## I.     ALNIC's and MCCAIN's Underlying Staffing and Steering Problems.

The Singapore Strait is a relatively confined space in one of the world's busiest shipping corridors.   Both ALNIC's and MCCAIN's crews knew that navigating the Strait required special precautions. Yet neither vessel was well prepared.   These failures, some of which were months in the making, created conditions ripe for disaster.   We consider conduct aboard ALNIC and MCCAIN in turn.

### a.   ALNIC's Staffing and Steering Problems.

ALNIC was by far the larger of the two vessels involved.   She is about 600 feet long.   Loaded with fuel oil at the time of the collision, ALNIC weighed about 39,000 metric tons.   When ALNIC was at full speed ahead, coming to a full stop required 7 minutes and 1.35 nautical miles.

Some of ALNIC's problems pertained to staffing.   ALNIC's manager, Stealth Maritime Corporation S.A. ("Stealth"), placed the vessel under internal regulations called the Safety Management System, or SMS.  The SMS required ships in the Singapore Strait to be at their greatest possible readiness, what Stealth called "Bridge Manning Level III."  Bridge Manning Level III called for five mariners staffing ALNIC's bridge (her command center), including a fully dedicated anti-collision officer and a fully dedicated lookout.

ALNIC's crew did not heed these requirements. On the morning of the collision on August 21, ALNIC was designated only at Bridge

---

[2] We draw our discussion from the trial record and the district court's post-trial opinion.  Except as noted otherwise, these facts are undisputed on appeal.

Manning Level II.  But in fact, with one crew member off duty and another working in the walled-off chart room when the collision occurred, the vessel was effectively at Bridge Manning Level I.  That meant there were only three people staffing the bridge, including ALNIC's captain, Ritchie Nolasco.  There was no anti-collision officer present and the lookout was serving simultaneously as the helmsman.

Other problems related to steering or, more precisely, the lack of steering.  The SMS required ALNIC to be under manual steering while in the Singapore Strait.  Instead, on August 21 and until after the collision, the ship remained on autopilot.  This issue was intertwined with the staffing shortfall: had ALNIC been properly off autopilot she would have been steered by the helmsman.  But that same seaman was also acting that morning as a lookout.

ALNIC's issues were no secret and no surprise.  During a routine audit in May 2017, Stealth's Marine Superintendent witnessed ALNIC improperly transit the Singapore Strait at Bridge Manning Level I.  The Superintendent testified that he instructed ALNIC's crew on proper conduct in the Strait, although Captain Nolasco and another ALNIC officer denied they received such instruction.

The Superintendent also stated more generally that, of the seventy vessels he had audited for Stealth, ALNIC's performance was among the two worst.  The Superintendent conveyed his concerns to Stealth, but the company took no action.

### b.  MCCAIN's Staffing and Steering Problems.

MCCAIN is smaller and more agile than ALNIC.  She is 505 feet long and weighs about 9,000 metric tons, as compared to ALNIC's 600 feet and 39,000 metric tons.  MCCAIN can stop "very quickly" compared to commercial vessels, but "not instantaneous[ly]."  *Matter*

*of Energetic Tank, Inc.*, 607 F. Supp. 3d 328, 336, 363 (S.D.N.Y. 2022) ("*Energetic Tank*").

MCCAIN's problems related primarily to the crew's use of a new steering system. Roughly one year before the collision, the Navy had installed on MCCAIN an Integrated Bridge and Navigation System, or "IBNS." The IBNS "look[ed] nothing like a traditional steering console." *Id.* at 336 (internal quotation marks omitted). Rather, the IBNS encompassed several steering stations on the bridge and elsewhere, each of which included both a touchscreen and physical buttons. Two manual steering wheels remained: one between the helm and lee helm stations on the bridge and the other at the aft steering station near the vessel's stern.

The IBNS allowed those in charge of the controls to transfer steering from one station to another. Ordinarily, both the station controlling steering and the station receiving steering would need to consent to this transfer. But when the IBNS was in "backup manual" mode, with some of its computer features disabled, one station could unilaterally seize steering control from another. One physical component of each IBNS station was the "Emergency Override to Manual" button, commonly known as the "Big Red Button." Pressing the Big Red Button at one station would unilaterally take control of steering away from any other station on MCCAIN.

MCCAIN's crew—including the ship's captain, Commander Alfredo Sanchez—lacked "basic . . . knowledge" of the IBNS. *Id.* at 340 (internal quotation marks omitted). This ignorance extended to the Big Red Button. Commander Sanchez and others mistakenly believed that pressing the Button would *send* steering control to the

aft steering station. Moreover, the crew did not understand that the Big Red Button operated unilaterally.

MCCAIN's IBNS was also unreliable in ways compounded by the crew's unfamiliarity with the system. The computer-driven IBNS had crashed several times, leading Commander Sanchez to complain to offboard Navy technicians. In fact, one technician was due in Singapore to repair the IBNS upon MCCAIN's arrival. In the meantime, Commander Sanchez's preferred "workaround" for IBNS glitches was to switch the destroyer to backup manual mode—"a system setting which affected steering control in ways that neither he nor his crew understood." *Id.* MCCAIN was in backup manual mode when the collision occurred.

MCCAIN, like ALNIC, also suffered staffing shortfalls. MCCAIN's officers had recommended an extensive "Sea and Anchor Detail" while navigating the Singapore Strait. Instead, Commander Sanchez opted for a more limited "Modified Navigation Detail." That still meant MCCAIN had fifteen crewmembers on her bridge at the time of the collision, but the sailors controlling thrust and steering were both fewer in number and less experienced than the Sea and Anchor Detail would have required.

## II.  MCCAIN's Loss of Steering Control and ALNIC's Initial Response.

In the early hours of August 21, 2017, ALNIC and MCCAIN were heading west in the busy Singapore Strait, both bound for Singapore. Under the Strait's Traffic Separation Scheme—essentially a maritime highway—each ship was in the same "lane." So, too, were several other vessels. ALNIC was ahead and to port (*i.e.*, left) of MCCAIN. Although the seas were calm and the weather clear, the pre-dawn sky

was dark and moonless.  MCCAIN was moving quickly by Strait standards, 20 knots, and was in the process of overtaking ALNIC.

Trouble began around 5:20:30 AM local time, which was 3 minutes, 28 seconds before the collision ("bc").  That was when Commander Sanchez ordered that MCCAIN's thrust control be transferred from one IBNS station (the helm) to another adjacent station (the lee helm).  Unbeknownst to all involved, however, the thrusts were "un-ganged," which meant the vessel's two propellers operated independently instead of in unison.  Consequently, when MCCAIN's crew carried out Commander Sanchez's order, only control of the port thrust shifted to the lee helm, while control of the starboard (*i.e.*, right) thrust remained with the helm.

Soon after, at 5:20:39 (3:19 bc), MCCAIN's helmsman reported that he had lost the ability to steer using the manual wheel between the helm and the lee helm.  A Navy investigation found that the crew had inadvertently transferred steering control from the helm to the lee helm when transferring the thrust to the lee helm.  *See* App'x at 4999–5000.  Before steering control was transferred, the helmsman had been steering slightly to starboard to maintain a steady course.  But when steering control was transferred, the rudders reset to a neutral position.  MCCAIN then began turning to port—toward ALNIC.  Within one minute, around 5:21:00 (2:58 bc), MCCAIN's crew announced loss of steering to the destroyer's bridge.

Crewmembers at the IBNS stations both on the bridge and at the aft steering position responded by pressing the Big Red Button, mistakenly thinking it would send control to aft steering.  Instead, because pushing the button *acquired* steering, "control of steering ping-ponged around the ship, with none of the crew understanding

where it was at any given time, or how to get it back." *Energetic Tank*, 607 F. Supp. 3d at 348.

Twenty-three seconds later, at 5:21:23 (2:35 bc), an announcement sounded on MCCAIN's internal and external speakers: "Loss of steering in the pilot house, loss of steering in the pilot house. Man aft steering." *Id.* Microphones on ALNIC's bridge wings picked up this announcement across the water.

At 5:21:25 (2:33 bc), at Commander Sanchez's order, MCCAIN's crew activated "red-over-red" lights on the ship's masthead. This configuration indicates to other vessels that a vessel is "not under command" and, hence, at risk of collision. Energetic denies that MCCAIN signaled red-over-red properly in all respects. We further address this issue below.

By 5:21:52 (2:06 bc), MCCAIN's veering to port was visible on ALNIC's X-band radar. Seconds later, Captain Nolasco prompted ALNIC's S-band radar to calculate whether ALNIC and MCCAIN were on a collision course. The calculation would take fifty seconds. During this time, ALNIC took no other action to avoid colliding with MCCAIN.

At 5:22:06 (1:52 bc), Commander Sanchez ordered MCCAIN's crew to reduce the vessel's speed from 20 knots to 10. MCCAIN's lee helmsman complied, not knowing that because the thrust remained

un-ganged, he was reducing only the port thrust, causing MCCAIN to veer even more to port, toward ALNIC's path.

The district court found that at 5:22:31 (1:27 bc), "reasonable mariners could [still] have disagreed [as to] whether MCCAIN would collide with ALNIC," given MCCAIN's apparent trajectory. *Id.* at 356.

### III.     ALNIC's Collision Alarm.

At 5:22:43 (1:15 bc), ALNIC's S-band radar completed its collision calculation and triggered a collision alarm on the bridge. Energetic argues that this alarm signaled only that MCCAIN was on course to be 0.27 nautical miles away from ALNIC. The district court, however, found that the alarm signified "an imminent actual collision, not just a close call." *Id.* at 351 n.12.

Two seconds after ALNIC's alarm began to blare, at 5:22:45 (1:13 bc), Commander Sanchez ordered MCCAIN's crew to reduce the destroyer's speed once more—now from 10 knots to 5. Still, unbeknownst to all, the thrust remained un-ganged. Trying to carry out Commander Sanchez's order, the lee helmsman again reduced only the port thrust, turning the vessel even more sharply.

At 5:22:58 (1:00 bc), ALNIC's crew silenced the collision alarm. ALNIC's autopilot course and speed remained unchanged.

### IV.     The Collision.

ALNIC's crew continued to passively observe MCCAIN as the destroyer drew near. At 5:23:02 (0:56 bc), someone on ALNIC's bridge observed that MCCAIN appeared to be trying to pass between ALNIC and another vessel. At first, the observer "guess[ed]" the maneuver

would work.[3]  *Id.* at 352.  Then, at 5:23:17 (0:41 bc), the same crewmember determined that MCCAIN was doing a "wrong maneuver."  *Id.*  The district court found that by 5:23:20 (0:38 bc), MCCAIN's veering was "glaringly apparent" on ALNIC's X-band radar.  *Id.*  Still, ALNIC kept her course and speed.  Neither vessel signaled danger by sounding its horn or attempted to contact the other by radio.

At 5:23:27 (0:31 bc), MCCAIN's crew at aft steering—the IBNS station near the destroyer's stern—secured control of MCCAIN's steering.  That station, however, had retained an earlier "hard left" order that took effect when aft steering gained rudder control.  Thus, for several seconds, MCCAIN turned still more to port, placing her almost directly in front of ALNIC.

At 5:23:44 (0:14 bc), MCCAIN finally began correcting course by turning to starboard.  Commander Sanchez testified that he recognized that a collision was imminent.  Yet he hoped that turning would at least avoid a "T-bone" impact and reduce the damage to MCCAIN.

That same moment, Captain Nolasco reduced ALNIC's engine from full ahead to half ahead—the vessel's first and only pre-collision adjustment.  Although this slowed the engine from 92 RPM to 73 RPM, it did not appreciably reduce ALNIC's speed before collision.

At 5:23:58, ALNIC and MCCAIN collided.  ALNIC's bow struck MCCAIN's port side at an angle of around 48.5 degrees, piercing the

---

[3] Audio on ALNIC's bridge was recorded by the tanker's black box.  The parties stipulated to the accuracy of the transcript cited in litigation and of any translations into English.

destroyer's hull and entering several crew compartments. For 66 seconds, the vessels remained entangled.

ALNIC's engine continued running at 73 RPM. Only 42 seconds after impact did Captain Nolasco order "all stop." And for another 20 seconds after that, ALNIC remained on autopilot.

ALNIC's continued propulsion and automatic navigation exacerbated the collision. While the vessels were entangled, ALNIC's computerized navigation system detected that ALNIC had veered to port and tried to redirect her. However, the combination of the vessels' momentum and ALNIC's automated maneuver caused ALNIC's bow to sweep over 45 degrees to starboard, tearing through more of McCAIN's hull.

The damage was terrible. McCAIN's Berthing 5, which was located below the waterline, flooded completely, drowning ten sailors. Three of McCAIN's decks were struck. Still more destruction—and potential death—was averted only through the swift and decisive action of McCAIN's crew.

## V.    False Statements by ALNIC's Crewmembers.

Several post-collision revelations warrant special mention here.

Discovery in this litigation revealed—as Energetic acknowledges—that ALNIC's crewmembers falsified entries in the

vessel's logs, obscuring what happened just before the collision. These lies included:

1. "[T]hat there was a fifth member of ALNIC's crew serving as the lookout when, in fact, there was not";

2. "[T]hat ALNIC was at Bridge Manning Level II before the collision, when it was really at Bridge Manning Level I because of the missing crewmembers";

3. "[T]hat the crew had stopped the engine . . . at 05:22," before the collision at 05:23:58, "when in fact it was only put to half ahead at 05:23:44 and was not stopped until about 05:24:30"; and

4. "[T]hat steering was switched from autopilot to manual steering several hours before the collision, at 03:00, when it actually remained on autopilot until after the collision."

*Id.* at 357.

The district court also found that two of ALNIC's crewmembers made other false statements not in the logs. *First*, one ALNIC seaman told investigators that he saw MCCAIN display regular lights, rather than red-over-red lights. That same seaman had falsified a log entry stating he was on ALNIC'S bridge on the morning of the collision. This led to a further lie that he had been well-positioned to see MCCAIN's lights. *Second*, Captain Nolasco testified in his deposition for this case that he had not seen MCCAIN display her red-over-red signal, but only red *sidelights*. Yet Captain Nolasco had earlier confirmed to

Singapore authorities that he *had* seen and understood MCCAIN's red-over-red signal.  He failed to explain this discrepancy.

Given these inconsistencies, the district court found that testimony by ALNIC's crewmembers that they never observed red-over-red lights on MCCAIN was not credible.

## PROCEDURAL HISTORY

On February 15, 2018, Energetic initiated this action under the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501–02, 30521–30.[4] That statute permits the owner of a vessel to limit its liability for any "injury by collision," including personal injury, to "the value of [that] vessel and pending freight."  *Id.* at § 30523(a)-(b); *see The 84-H*, 296 F. 427, 430 (2d Cir. 1923).  "The animating premise of the [Act] is that the owner of a vessel is generally an absentee who entrusts the vessel to the command of a captain whom the owner has limited ability to supervise or control once the vessel is on the sea."  *Bensch v. Est. of Umar*, 2 F.4th 70, 73 (2d Cir. 2021).  "The Act thus protects the owner of a vessel from unlimited vicarious liability for damages caused by the negligence of his captain or crew."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 244 (2d Cir. 2014).

To benefit from this limitation, the collision must have occurred "without the privy or knowledge of the owner."  46 U.S.C. § 30523(b).  "The phrase 'privity or knowledge' is a 'term of art meaning complicity in the fault that caused the accident.'"  *In re Complaint of Messina*, 574 F.3d 119, 126 (2d Cir. 2009) (quoting *Blackler v. F. Jacobus Transp. Co.*, 243 F.2d 733, 735 (2d Cir. 1957) (per curiam)).  Thus, if Energetic could establish that it was not complicit in ALNIC's

---

[4] Sections 30521–30 correspond to what the district court, relying upon an earlier version of the Act, cited as §§ 30503–12.

collision with MCCAIN, Energetic's liability would be limited to the value of ALNIC and her freight.

Since the goal of the limitation action is to cap the owner's liability, the Act also channels claims. A liability cap is valuable only when potential liabilities would otherwise exceed the cap. So when claims exceed the value of the ship and her freight, the Act provides that "all claimants shall be paid in proportion to their respective losses." 46 U.S.C. § 30525(1). To calculate the proportion to which each claimant is entitled and to ensure an equitable distribution, all claims against a shipowner arising from the collision must be brought within the limitation action; any preexisting actions are enjoined. *See id.* at § 30529(c); Rule F(3) of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure. Following Energetic's petition for limitation or exoneration, forty-two parties filed claims against Energetic. Of these, forty-one were Navy sailors or their representatives, who filed claims for death or injury; the other was the United States, which filed a claim for MCCAIN's damages. Energetic also counterclaimed for contribution or indemnity from the United States, invoking the Suits in Admiralty Act, 46 U.S.C. § 30903, and the Public Vessels Act, 46 U.S.C. § 31102.

The district court bifurcated proceedings. In Phase 1, the court would determine apportionment of fault between ALNIC and MCCAIN. In Phase 2, the court would adjudicate the wrongful death and personal injury claims.

On January 10, 2020, the district court granted Energetic's motion to apply Singapore law both to determine liability and to calculate damages. Three groups of Sailor-Claimants—the "Sanfilippo Claimants," the "Hofmann & Schweitzer Claimants," and

the "Tabak Claimants"—sought reconsideration of this decision. The district court denied reconsideration.

Before trial, the United States and Energetic stipulated that, excluding interest, MCCAIN's damages were $185,000,000 and ALNIC's were $442,445.

In November 2021, the district court conducted a five-day, Phase 1 bench trial to apportion liability. On June 15, 2022, the district court issued a post-trial opinion and order allocating 80% of fault for the collision to MCCAIN and 20% to ALNIC. The district court, finding privity or knowledge on the part of Energetic, declined to limit Energetic's liability. This resulted in Energetic's responsibility for around $37 million in vessel damages, plus interest—20% of MCCAIN's damages less 80% of ALNIC's damages.

In brief, the district court concluded that ALNIC's negligence proximately caused the collision and resulting damage in three respects. *First*, her bridge was "understaff[ed]" "in the heavily trafficked Singapore Strait." *Energetic Tank*, 607 F. Supp. 3d at 363. *Second*, ALNIC failed to turn or significantly slow down starting at 5:23:17 (0:41 bc), at which time "it should have been clear to everyone that MCCAIN could no longer avoid the collision by her actions alone." *Id.* at 367. And *third*, ALNIC "left her engines running for 42 seconds after the collision and left her autopilot on for over a minute," which exacerbated the damage to MCCAIN. *Id.* at 368. The district court also determined that ALNIC's fault was compounded by her crew's false statements after the collision. *See id.* at 368–69.

Energetic and the United States both filed interlocutory appeals.[5] On October 5, 2022, we remanded the case at the district

---

[5] The United States withdrew its cross-appeal with prejudice before briefing was complete.

court's request so that, among other things, the district court could certify its post-trial order as a final judgment. The next day, the district court ordered that its June 15 order "was intended to be a final judgment regarding the United States" under Fed. R. Civ. P. 54(b), and that there was "no just reason for delay" in issuing that judgment. Special App'x at 73.

On October 12, 2022, the district court issued an opinion and order addressing the United States's defense of sovereign immunity. The district court concluded that, although the United States had waived its sovereign immunity against Energetic's counterclaim for *vessel damages*, it had not done so against Energetic's counterclaims for contribution for or indemnification against potential *personal damages*. The district court therefore dismissed Energetic's contribution and indemnification claims. In the same opinion, the district court declined to stay the case pending appeal.

On October 13, 2022, we reinstated the appeal without a new notice of appeal under *United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

On November 4, 2022, the Hofmann & Schweitzer and the Tabak Claimants (together, the "Cross-Appellants") filed cross-

appeals to contest the district court's decision to calculate damages using Singapore law.[6]

## DISCUSSION

### I.      Jurisdiction.

We begin, as we must, by "assur[ing] ourselves" of our appellate jurisdiction. *Maye v. City of New Haven*, 89 F.4th 403, 406 (2d Cir. 2023) (per curiam) (internal quotation marks omitted). We conclude that we have jurisdiction to consider Energetic's appeals of the district court's Phase 1 order and of the district court's order dismissing Energetic's contribution and indemnification claims. By contrast, we lack jurisdiction over the cross-appeals challenging the district court's choice-of-law decision. We therefore dismiss the cross-appeals.

### A. General Principles of Appellate Jurisdiction.

"The jurisdiction of the federal courts of appeals to entertain appeals from decisions of the district court[s] is circumscribed by statute." *Petrello v. White*, 533 F.3d 110, 113 (2d Cir. 2008). In this case, we look primarily to two provisions of the federal Judicial Code, § 1291 and § 1292, and to the judicial rules and doctrines implementing those sections.

Section 1291 establishes the baseline rule. That provision permits us to hear appeals from "final decisions of the district courts." 28 U.S.C. § 1291.[7] Final decisions are "embodied" in final judgments.

---

[6] The Sanfilippo Claimants also filed a cross-appeal, which they, too, withdrew with prejudice while this appeal was pending.

[7] Section 1291 provides, in relevant part: "The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of

*Transp. Workers Union of Am., Loc. 100 v. N.Y.C. Transit Auth.*, 505 F.3d 226, 230 (2d Cir. 2007). Ordinarily, such judgments "conclusively determine[] all pending claims of all the parties to the litigation, leaving nothing for the court to do but execute its decision." *Petrello*, 533 F.3d at 113. Both the Federal Rules of Civil Procedure and our precedent, however, embrace a "practical construction" of § 1291, permitting appeals from a limited class of other orders we consider "final," *Will v. Hallock*, 546 U.S. 345, 349 (2006), even though they do not "resolve all claims of all parties," *Scottsdale Ins. Co. v. McGrath*, 88 F.4th 369, 376 (2d Cir. 2023).

Federal Rule of Civil Procedure 54(b) authorizes appeals from certain "*partial* final judgment[s]" addressing "fewer than all parties" or resolving fewer than "all claims."[8] *Scottsdale*, 88 F.4th at 376. Such judgments must be expressly designated for appeal by the district court, as we discuss below. This procedure was "designed to permit acceleration of appeals in multiple-claim cases," *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 416 (2015), while leaving "unimpaired the

---

the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court." 28 U.S.C. § 1291.

[8] Rule 54(b) provides: "When an action presents more than one claim for relief--whether as a claim, counterclaim, crossclaim, or third-party claim-- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).

statutory concept of finality prescribed by [§] 1291," *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 434 (1956).

Another rule, the "collateral order doctrine," permits appeals from a "small class" of rulings that do not resolve the merits of any claim. *Will*, 546 U.S. at 349 (internal quotation marks omitted). Like Rule 54(b), the collateral-order doctrine is not "an exception to" § 1291's "final decision rule," but an application of it. *Id.* (internal quotation marks omitted). This doctrine has a "modest scope": it permits appeals only of those rare decisions "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* (internal quotation marks and citation omitted).

Finally for our purposes, 28 U.S.C. § 1292 gives us jurisdiction over appeals from some interlocutory—that is, non-final—orders, including those pertaining to injunctions, the appointment of receivers, and other limited matters. Relevant here is 28 U.S.C. § 1292(a)(3), which establishes our jurisdiction over some "[i]nterlocutory decrees . . . determining the rights and liabilities of the parties to admiralty cases."[9] That such appeals are available in admiralty, but not in other areas, reflects "the once common admiralty practice of referring the determination of damages to a master or commissioner after resolving the issue of liability." *Chem*

---

[9] Section 1292(a)(3) provides, in relevant part: "[T]he courts of appeals shall have jurisdiction of appeals from . . . (3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." 28 U.S.C. § 1292(a)(3).

*One, Ltd. v. M/V RICKMERS GENOA*, 660 F.3d 626, 638 (2d Cir. 2011)
(internal quotation marks and citation omitted).

For us to decide the various appeals now before us, we must
have jurisdiction either under § 1291 (as implemented by Rule 54(b)
or the collateral-order doctrine) or under § 1292(a)(3).

### B. The District Court's Phase 1 Order Was Appealable under 28 U.S.C. § 1291 and Rule 54(b) as a Partial Final Judgment Pertaining to Damage to the Vessels and Apportionment of Liability.

We first consider whether the district court's Phase 1 order was
an appealable "final decision[]" under 28 U.S.C. § 1291.  The Phase 1
order did not "resolve all claims of all parties."  *Scottsdale*, 88 F.4th at
376.  Rather, it left for a Phase 2 trial the Sailor-Claimants' claims for
personal damages.  Nonetheless, the parties invoke our jurisdiction
over appeals from partial final judgments under Rule 54(b).[10]

Rule 54(b) does not automatically permit appeal of every
partial final judgment.  Rather, the district court must exercise its
discretion to invoke the Rule and certify the appeal.  *See Harriscom
Svenska AB v. Harris Corp.*, 947 F.2d 627, 629 (2d Cir. 1991).
Certification is appropriate only to serve the "interests of sound
judicial administration" or to avoid "some danger of hardship or
injustice through delay which would be alleviated by immediate
appeal."  *Id.* (internal quotation marks and citation omitted and
alteration incorporated).  Consistent with this requirement, the
district court must (1) "expressly determine[] that there is no just

---

[10] The district court observed in a letter to this court that we would likely
have jurisdiction over this appeal under 28 U.S.C. § 1292(a)(3), even absent
a Rule 54(b) certification.  Because we conclude that our jurisdiction is
secure under § 1291, we need not address that theory.

reason for delay," Fed. R. Civ. P. 54(b), and (2) provide "a brief, reasoned explanation" for that determination, *Scottsdale*, 88 F.4th at 378 (internal quotation marks omitted).  This explanation must ordinarily offer "well-reasoned conclusions" rather than "mere boiler-plate approval." *Novick v. AXA Network, LLC*, 642 F.3d 304, 310 (2d Cir. 2011) (internal quotation marks and citation omitted).  However, we may "excuse[] a failure to state reasons '[w]here the reasons . . . are obvious . . . and a remand to the district court would result only in unnecessary delay in the appeal process.'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 355 (2d Cir. 2011) (quoting *Fletcher v. Marino*, 882 F.2d 605, 609 (2d Cir. 1989)).

Rule 54(b)'s application is limited in two-phase proceedings such as this one.  An order "limited to the issue of liability, which reserves the issue of damages and other relief is not final within the meaning of 28 U.S.C. § 1291." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 323 (2d Cir. 2018) (internal quotation marks and citation omitted).  Such an order is therefore "not certifiable pursuant to Rule 54(b)." *Id.* (internal quotation marks and citation omitted).  That said, Rule 54(b) does authorize certification where the district court has both determined liability and "fixed the damages." *Id.* (internal quotation marks and citation omitted).

The district court did not abuse its discretion by certifying its June 15, 2022 Phase 1 order as a partial final judgment.  The Phase 1 opinion and order resolved the United States's liability in its claim for damages against Energetic.  Moreover, here, as in *Linde*, the damages were "fixed": the parties had agreed upon the monetary damages to MᴄCᴀɪɴ and to Aʟɴɪᴄ.  Finally, the district court concluded that "the Phase I Opinion presents one judgment, neatly bundled" for appellate review; that certification would avoid "unnecessary delay in the appeal process;" and that there was little risk of "piecemeal appeals." Special App'x 74.  The district court provided little justification for

these conclusions. Nonetheless, and especially in view of our previous remand for the purpose of certification, the district court's explanation was adequate. *See Brown*, 654 F.3d at 355. We therefore have jurisdiction under § 1291 to review the Phase 1 opinion.

### C. The District Court's Order Dismissing Energetic's Contribution and Indemnity Claims Was Appealable as an Interlocutory Admiralty Order under 28 U.S.C. § 1292(a)(3).

The district court's October 12, 2022 order concerning sovereign immunity implicates a different provision: § 1292(a)(3).

Contrary to Energetic's suggestion, § 1291 is inapplicable to the sovereign-immunity order. In general, orders that "allow the litigation to continue are not final for purposes of § 1291 and therefore are not immediately appealable." *Ashmore v. CGI Grp., Inc.*, 860 F.3d 80, 84 (2d Cir. 2017) (per curiam) (internal quotation marks and citation omitted and alteration incorporated). That includes orders that dismiss some but not all claims. Here, the district court dismissed Energetic's contribution and indemnity claims against the United States as barred by sovereign immunity but left other issues for later resolution. And unlike its earlier Phase 1 order, the district court did not certify its dismissal order under Rule 54(b). No other exception relevant to § 1291 applies. Thus, the dismissal order was not a "final" order under § 1291 and is not appealable under that statute.

Even so, we may review certain interlocutory orders in admiralty cases under a different provision. Federal courts of appeals generally "have jurisdiction of appeals from: . . . (3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." 28 U.S.C. § 1292(a)(3). This rule

broadens our interlocutory appellate jurisdiction beyond its ordinary bounds. *See generally* 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3927 (3d ed. 2023).

Section 1292(a)(3) establishes our jurisdiction here. Because the order dismissing Energetic's contribution and indemnification claims was not final, it was "[i]nterlocutory." 28 U.S.C. § 1292(a)(3); *see Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 668 (7th Cir. 1998). Nor is there any question that this "case . . . includes an admiralty or maritime claim," Fed. R. Civ. P. 9(h)(2), such that it is an "admiralty case[]," 28 U.S.C. § 1292(a)(3); *see Energetic Tank*, 607 F. Supp. 3d at 335 n.1. That leaves the "crucial inquiry" of "whether the district court's judgment . . . determined the rights and liabilities of the parties"— that is, whether it "decid[ed] the merits" of the parties' "controversies." *Chem One*, 660 F.3d at 638 (internal quotation marks and citation omitted and alterations incorporated). It did. We have previously held that an order dismissing a cause of action in an admiralty case on sovereign-immunity grounds is appealable under § 1292(a)(3). *See Isbrandtsen Tankers, Inc. v. Pres. of India*, 446 F.2d 1198, 1199 n.1 (2d Cir. 1971). This case is similar. We therefore have jurisdiction to review the district court's October 12, 2022 order.

### D. The District Court's Order on Choice of Law Was Not Appealable as a Collateral Order.

The same cannot be said of the district court's January 10, 2020 order that Singapore law would apply to the calculation of damages. Cross-Appellants offer two theories supporting our jurisdiction. Neither succeeds.

*First*, Cross-Appellants argue that the district court's Rule 54(b) certification rendered appealable its earlier choice-of-law ruling. This argument implicitly invokes our usual rule that "prior interlocutory

orders merge with the final judgment in a case, and the interlocutory orders (to the extent that they affect the final judgment) may be reviewed on appeal from the final order." *Selletti v. Carey*, 173 F.3d 104, 109 n.5 (2d Cir. 1999) (internal quotation marks omitted).

The merger rule does not support Cross-Appellants' position. In considering an appeal of a *partial* final judgment, we must construe strictly the requirement that an interlocutory order "affect the final judgment," lest we nullify Rule 54(b)'s limitations. *Id.*; *see also Black Ass'n of New Orleans Fire Fighters (BANOFF) v. City of New Orleans*, 911 F.2d 1063, 1065–66 (5th Cir. 1990). In this case, the district court stated that its Phase 1 order "was intended to be a final judgment regarding the United States" and its "liability and damages for the collision." Special App'x at 73. Thus, only earlier orders that affect the United States's liability merge on appeal into the Phase 1 order. The district court's choice of law for calculating Sailor-Claimants' personal damages did no such thing. Accordingly, Rule 54(b) does not give us jurisdiction over the cross-appeals.

*Second*, the Hofmann & Schweitzer Claimants suggest that the district court's choice-of-law ruling is an appealable collateral order. Non-final orders are reviewable under the "collateral order doctrine" only when they "(1) are 'conclusive'; (2) 'resolve important questions separate from the merits'; and (3) 'are effectively unreviewable on appeal from the final judgment in the underlying action.'" *Belya v. Kapral*, 45 F.4th 621, 629 (2d Cir. 2022) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)).

The collateral-order doctrine does not apply here. We have warned that this exceptional doctrine should "'never be allowed to swallow the general rule that a party is entitled to a single appeal' *after* 'final judgment has been entered.'" *Id.* (emphasis added) (quoting *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868

(1994)).  Here, we see no reason why the district court's choice-of-law order would be "effectively unreviewable on appeal from the final judgment."  *Id.* (internal quotation marks omitted).  Rather, we believe permitting Cross-Appellants' "piecemeal, prejudgment appeals" would "undermine[] 'efficient judicial administration.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981)).  Thus, the choice-of-law ruling on damages, as distinct from the apportionment of liability, is not yet appealable.

Cross-Appellants have identified no basis for our jurisdiction over their appeals.[11]  We therefore must dismiss the cross-appeals.

## II.    Applicable Substantive Law.

The district court applied Singapore law in determining the United States' and Energetic's liability for the collision.  No party contests that decision.  Although we retain discretion to reach this "purely legal issue," we decline to do so here.[12]  *Booking v. Gen. Star*

---

[11] The Hofmann & Schweitzer Claimants also invoke in passing 28 U.S.C. § 1292(a)(3) as an alternative basis for our jurisdiction.  That "perfunctor[y]" reference failed to preserve any argument as to that provision's application to the cross-appeals.  *Meyer v. Seidel*, 89 F.4th 117, 129 (2d Cir. 2023).  In any event, the district court's choice-of-law ruling did not "determin[e] the rights and liabilities of the parties," as § 1292(a)(3) requires.

[12] Unlike the district court's choice of law for calculating damages, its choice of law for determining liability "affect[ed]" the appealable partial final judgment.  *Selletti*, 173 F.3d at 109 n.5.  To that extent, we have jurisdiction to review the January 10, 2020 order.  Because we decline to undertake that review, we need not—and do not—decide whether we have pendent jurisdiction over the cross-appeal, as the Tabak Claimants argue in their reply brief.  Tabak Reply Br. at 9–11.

*Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir. 2001).  Instead, we join the district court in applying Singapore law.

In this case, the standards for determining liability for the collision are clear.  That is because "[t]he elements of negligence under Singapore law are substantially the same as those under United States admiralty law: 'Typically, claimants have to establish breach of duty (that a vessel owes a duty of care to other vessels is well-established) that caused or contributed to the collision and damage.'" *Energetic Tank*, 607 F. Supp. 3d at 358–59 (quoting *The Dream Star* [2018] 4 SLR 473 at [47]).[13]  The relevant duty is "the exercise of 'good seamanship'"—that is, "the exercise of reasonable skill or care expected of a competent/prudent seaman to prevent the vessel from doing injury."  *Id.* (citation omitted).

In evaluating negligence under this standard, we follow Singapore courts in treating decisions of "common law courts around the world"—and especially of English courts—as persuasive authority.  App'x at 1366; *see, e.g.*, *The Dream Star* at [89]–[93]; *The Mount Apo and Hanjin Ras Laffan* [2019] 4 SLR 909 at [95]; *see also* App'x at 2781.  As expert testimony indicated, this reflects that "Singapore's legal system is built on a two hundred years of the English common law tradition" and "Singapore law on maritime collisions [remains] closely similar to English law" in relevant respects.  App'x at 1359; *see id.* at 2781.

Consistent with Singapore law, we also look to the universally accepted International Regulations for Preventing Collisions at Sea,

---

[13] When citing foreign cases, we follow the conventions of the Singapore Academy of Law's Style Guide for the Singapore Law Reports.  "SLR" refers to the Singapore Law Reports.  Pinpoint citations in brackets refer to paragraph numbers.  Each of the Singapore cases we cite was decided by the High Court of the Republic of Singapore.

or "COLREGs."   The COLREGs "provide a 'universal system of sea traffic rules' applicable to vessels in international waters."  *Crowley Marine Servs., Inc. v. Maritrans, Inc.*, 530 F.3d 1169, 1172 (9th Cir. 2008) (quoting William Tetley, International Maritime and Admiralty Law 237 (2002)).   Singapore has incorporated the COLREGs into its domestic law and its courts consider them when evaluating maritime negligence.[14]  *See The Dream Star* at [2], [47]–[50].  Accordingly, the COLREGs are central to our analysis.

### III.    Standards of Review.

Although we look to Singapore law for the relevant substantive negligence rules, federal law supplies the applicable standards of appellate review.  *See Otal Invs. Ltd. v. M.V. Clary*, 494 F.3d 40, 50 (2d Cir. 2007) ("*Otal II*"); *Alkmeon Naviera, S.A. v. M/V Marina L*, 633 F.2d 789, 796 n.11 (9th Cir. 1980).  These standards generally track those applicable in other areas of federal law.  *See Tandon*, 752 F.3d at 240 n.1.

In reviewing a judgment entered after a bench trial, we review the district court's factual findings only for clear error.  *See Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 297 (2d Cir. 2009).  The causes of a maritime collision are factual findings, *see Otal II*, 494 F.3d at 59, as is a district court's apportionment of liability for such a collision, *see Otal Invs. Ltd. v. M/V CLARY*, 673 F.3d 108, 113 (2d Cir. 2012) ("*Otal IV*") (per curiam).  Thus, we must set aside the district court's conclusions on these issues only if, upon reviewing the entire record, we are "left with the definite and firm conviction that a mistake has been committed."  *Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82

---

[14] The same is true for the United States and "every [other] shipping nation in the world."  *Crowley Marine Servs.*, 530 F.3d at 1172 (internal quotation marks omitted).

F.4th 144, 153 (2d Cir. 2023) (internal quotation marks and citation omitted).

Questions of law are different. In this context, as elsewhere, "[w]e review conclusions of law, and the application of the law to the facts, *de novo*." *Vasquez*, 582 F.3d at 297. "[A] court's determination of foreign law 'must be treated as a ruling on a question of law'" subject to *de novo* review. *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 42 (2018) (quoting Fed. R. Civ. P. 44.1). This principle extends to a court's interpretation of the COLREGs.[15] *See, e.g., Otal II*, 494 F.3d at 53. We are therefore unconstrained by the district court's interpretations either of Singapore law in general or of the COLREGs in particular.

Review of a district court's determination of negligence is more complicated. "[T]he rule in this circuit has long been to consider [rulings on negligence] *de novo*." *In re M/V MSC Flaminia*, 72 F.4th 430, 446 (2d Cir. 2023). We adhere to that rule here. We acknowledge that we are alone among our sister circuits in embracing this standard and that some on our court have thoughtfully suggested in *dicta* that we should embrace the majority rule. *See, e.g., Payne v. United States*, 359

---

[15] Contrary to the Government's suggestion, we do not read *Ching Sheng Fishery Co. v. United States*, 124 F.3d 152 (2d Cir. 1997), as mandating that we treat "[a] district court's determination that a ship violated the COLREGs" as "a finding of fact." U.S. Br. at 24. In *Ching Sheng*, the COLREGs questions were predominantly factual, not legal. For example, we observed that "[t]he question of what constitutes a 'safe speed' is relative to the situation confronting the vessel at any given moment" and accordingly analyzed the "situation" of the vessel involved. *Ching Sheng*, 124 F.3d. at 159 (quoting COLREG 6). Thus, *Ching Sheng* indicates only that, in some cases, a district court's finding concerning COLREGs violations may effectively be subject to clear-error review because the interpretation of the COLREGs is not at issue. It does not support the Government's proposed broader rule that such findings are always subject to clear-error review.

F.3d 132, 135–137 & n.2 (2d Cir. 2004). At any rate, "in practice," our rule is "'not so different' from the other circuits' more deferential standard of review." *M/V MSC Flaminia*, 72 F.4th at 446 (quoting *In re City of New York*, 522 F.3d 279, 282 (2d Cir. 2008)). In most cases, negligence determinations turn upon factual findings subject to clear-error review. *See id.* Thus, when a district court makes no error interpreting applicable law and no clear error in finding material facts, we ordinarily will sustain that court's negligence determination.

## IV. Fault.

We now turn to the merits. Energetic claims that 100% of the fault rests with MCCAIN and that, in attributing 20% of the fault to ALNIC, the district court erred. Energetic advances two principal arguments in support of its position: (1) the district court erred in concluding that ALNIC was "free to maneuver" when MCCAIN activated her red-over-red lights; and (2) the district court erred in finding that ALNIC negligently failed to mitigate the damage to MCCAIN either before or after the moment of the collision. Energetic also contends that the district court improperly considered the dishonesty of ALNIC's crewmembers following the collision when allocating fault.

Energetic leaves unchallenged one of the district court's central conclusions: that ALNIC was negligent in her failure to properly staff her bridge and to assess the risk of collision in the "heavily trafficked Singapore Strait." *Energetic Tank*, 607 F. Supp. 3d at 363–64. COLREGs Rule 5 requires vessels to "maintain a proper look-out" "at all times."[16] Rule 7(a) requires vessels to "use all available means appropriate" to determine the risk of collision. ALNIC violated both

---

[16] In discussing the parties' fault, we cite provisions of the COLREGs simply as "Rule [Number]."

rules.  Her short-staffed crew relied inappropriately on autopilot and missed crucial signs of collision risk, including MCCAIN's audio announcement of "loss of steering."  *Id.* at 364.  The district court concluded that these COLREGs violations by ALNIC were proximate causes of the collision, which enhanced the tanker's overall fault.  The district court did not err in doing so.

We will briefly set forth the key provisions of the COLREGs governing the arguments Energetic does raise.  We then consider— and reject—each argument in turn, ultimately concluding that the district court did not err in concluding that ALNIC was negligent under Singapore law.  We also hold that the district court did not clearly err in allocating 20% of the fault for the collision to ALNIC and 80% to MCCAIN.

### a. Rule 17's Three-Tier Framework for the Obligations of Stand-On Vessels.

Among much else, the COLREGs establish a "three-tier framework" governing when vessels may not, may, or must take affirmative action to avoid collision.  *Id.* at 366.

1. Rule 17(a)(i) requires that a stand-on vessel—that is, a vessel being overtaken—generally "shall keep her course and speed."

2. Rule 17(a)(ii) provides that a stand-on vessel "may . . . take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the [give-way] vessel"—that is, a vessel overtaking another—"is not taking appropriate action in compliance with these Rules."

3. Rule 17(b) mandates that "[w]hen, from any cause, the [stand-on] vessel . . . finds herself so close that collision cannot be avoided by the action of the give-way vessel

alone, she shall take such action as will best aid to avoid collision."

Because the COLREGs will inform our negligence analysis, we must examine which Rule applied to stand-on vessel ALNIC at each relevant period on August 21, 2017. *See The Dream Star* at [47].

### b. The District Court's Finding that ALNIC Was "Free to Maneuver" after MCCAIN Activated Her Red-Over-Red Lights Was Not Material to the Allocation of Fault.

Energetic first challenges the district court's analysis of when Rule 17(a)(i) ceased to apply and Rule 17(a)(ii) became operative.

The district court concluded that Rule 17(a)(ii) took effect once MCCAIN energized her red-over-red lights at 5:21:25 (2:33 bc). ALNIC was therefore "free to maneuver" to reduce the risk of collision. *Energetic Tank*, 607 F. Supp. 3d at 366. The district court determined that Rule 17(b) took effect 112 seconds later, at 5:23:17 (0:41 bc). That was when an ALNIC crewmember concluded that MCCAIN was doing a "wrong maneuver" and when "it should have been clear to everyone that MCCAIN could no longer avoid the collision by her actions alone." *Id.* at 367. At that point, ALNIC was "*required*" to act. *Id.*

Energetic disagrees. It argues that Rule 17(a)(ii) *never* controlled. Rather, Rule 17(a)(i) prohibited ALNIC from changing her course or speed until 5:23:17 (0:41 bc). Energetic primarily adverts to (1) MCCAIN's putative failure to de-activate her masthead lights upon activating her red-over-red lights; and (2) the difficulty of determining what action was appropriate for ALNIC given the available information. Energetic does not challenge the district court's conclusion concerning Rule 17(b)—that once MCCAIN was

plainly making the "wrong maneuver," ALNIC was obligated to "take such action as [would] best aid to avoid collision." Rule 17(b).

Energetic's argument is misdirected. Under Singapore law, liability in maritime-collision cases must be apportioned "to the degree in which each ship was in fault." Maritime Conventions Act 1911 § 1(1); *accord The Mount Apo* at [94]–[96]; *The Dream Star* at [124]–[127]. The Brussels Collision Liability Convention of 1910, which Singapore has ratified, imposes a similar framework. *See* Thomas J. Schoenbaum, 2 Admiralty & Mar. Law § 14:5 (6th ed. 2023). Singapore courts have made clear that "the determinative factor for apportionment is . . . the comparative appreciation of the degree in which the respective faults of the vessels have contributed to the result of the collision." *The Dream Star* at [125]. Although allocation of liability requires considering "the nature and quality of a ship's faults," *id.* at [126] (citation omitted), "[i]t is not a question of distributing moral blame," *id.* at [125]. Thus, only legal fault—here, negligence—is relevant.

The district court nowhere concluded that ALNIC's failure to act between 5:21:25 and 5:23:17 (when Rule 17(a)(ii) authorized ALNIC to maneuver to avoid collision) was negligent. Rather, as relevant here, the district court concluded only that "Rule 17(b) required ALNIC to act by 5:23:17." *Energetic Tank*, 607 F. Supp. 3d at 367 (emphasis omitted). Later, it elaborated that after ALNIC's crew observed MCCAIN's "wrong maneuver," "ALNIC dallied in autopilot and failed to take any action at all; *that choice* was negligent." *Id.* (emphasis added). To be sure, the district court criticized ALNIC for "forfeit[ing] valuable time and sea space" after Rule 17(a)(ii) took effect. *Id.* (internal quotation marks omitted). But the district court also recognized that Rule 17(a)(ii) created a "grey area" that might deceptively seem clear in "hindsight." *Id.* (internal quotation marks

omitted).  We do not read the district court's Rule 17(a)(ii) analysis as encompassing a negligence determination.

Nor did the district court rely on that analysis to allocate fault. The district court correctly stated Singapore law governing apportionment of liability: "Under the Brussels Convention, courts consider both 'the relative culpability of each vessel and the relative extent to which the culpability of each caused the collision.'"  *Id.* at 359–60 (quoting *Otal II*, 494 F.3d at 63).  True, the district court may have "distribut[ed]" some "moral blame."  *The Dream Star* at [125]. But what matters is whether those moral judgments improperly influenced the court's legal conclusions.  We perceive no such influence here.

The district court allocated no fault to ALNIC for her actions in the 112 seconds after MCCAIN signaled red-over-red.  We find neither clear error in this apportionment nor error in the district court's underlying legal analysis.

### c. The District Court Did Not Err in Concluding that ALNIC Negligently Failed to Mitigate the Collision Damage Both Before and After Striking MCCAIN.

Energetic next contests the district court's analysis of ALNIC's duty to mitigate collision damage under Rule 17(b).  The district court concluded that ALNIC was negligent both in the 41 seconds preceding the collision (after ascertaining MCCAIN's "wrong maneuver") and in

the 42 seconds following the moment of impact.  Energetic challenges both conclusions.  We consider them in sequence.

### 1. The District Court Did Not Err in Concluding that ALNIC Negligently Failed to Mitigate the Collision Damage Before Striking MCCAIN.

The district court identified two maneuvers available to ALNIC in the 41 seconds before the collision, starting at 5:23:17.  First, by slowing down, ALNIC would have "reduc[ed] the force of impact." *Energetic Tank*, 607 F. Supp. 3d at 367.  Second, by turning hard to port—the same direction in which MCCAIN was veering—ALNIC would have struck MCCAIN with a "glancing blow" rather than a "T-bone."  *Id.* at 367 & n.22.  Expert testimony confirmed that together, these maneuvers would have "meaningfully mitigated the collision." *Id.* at 367; *see id.* at 356.  The district court accordingly concluded that ALNIC's choice not "to take any action at all" during this period was negligent.  *Id.* at 367.

Energetic asserts that "no evidence" supported the district court's finding that a hard turn to port would have reduced the collision damage.  Energetic Br. at 56.  "On this record," Energetic insists, "it is just as probable that a glancing blow would have opened more of MCCAIN's compartments and caused more flooding, or flooded MCCAIN's engine room, or ruptured ALNIC's tanks containing explosive pyrolysis fuel oil."  *Id.* at 58.

We find Energetic's assertion unpersuasive.  *First*, Energetic effectively ignores ALNIC's failure to slow down.  ALNIC's duty to reduce her speed was clear.  *Cf.* Rule 8(e).  When it is "impracticable" for a vessel "to avoid collision," it may well be "imperative for her to reverse full speed astern."  *The Etruria*, 147 F. 216, 217 (2d Cir. 1906);

*cf. The Umbria*, 166 U.S. 404, 414 (1897); *The Persian*, 224 F. 441, 443 (2d Cir. 1915). That principle of prudent seamanship applied here.

ALNIC's imprudent conduct almost certainly caused greater collision damage. In the ordinary course, a collision at higher speed will be more destructive than one at lower speed. No expert testimony was needed to establish this common-sense precept. *Cf. Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) Thus, the district court did not clearly err in finding that ALNIC's failure to slow down before the collision had "causative potency." *The Mount Apo* at [95] (internal quotation marks, citation, and emphasis omitted). Nor did the district court err in concluding that ALNIC's actions in this regard amounted to negligence.

*Second*, Energetic does not seriously contest the district court's finding that ALNIC should have turned to port. Here again, ALNIC's duty was apparent. We determine the demands of good seamanship by looking to the conduct of a prudent mariner under the circumstances. *See The Iran Torab* [1988] 2 Lloyd's Rep. 38, 43 RHC.[17] From this perspective, good seamanship required doing what would *likely* reduce collision damage. *See* Rules 2(a), 6, 7. That every option involved some risk did not change ALNIC's obligation to act reasonably. In this case, witness testimony sufficiently supported the district court's conclusion that reducing ALNIC's angle of collision was a reasonable option. *See* App'x at 1562–63; 1755–56.

Energetic's contentions concerning causation are merely speculative. Evidence showed that because ALNIC struck MCCAIN at 48.5 degrees and not some smaller angle, she pierced MCCAIN's hull and the two vessels became entangled. *See* App'x at 2026–27.

---

[17] Consistent with the conventions of the Singapore Academy of Law, "LHC" and "RHC" refer to the left-hand and right-hand columns of pages in Lloyd's Law Reports.

Energetic has not established that the district court's finding to this effect was clearly erroneous. *See Vasquez*, 582 F.3d at 297. Accordingly, the district court did not err in finding that ALNIC's failure to turn was a "causative fault" amounting to negligence. *The Mount Apo* at [95].

### 2. The District Court Did Not Err in Concluding that ALNIC Negligently Failed to Mitigate the Collision Damage After Striking MCCAIN.

The district court also faulted ALNIC for "le[aving] her engines running for 42 seconds after the collision and le[aving] her autopilot on for over a minute." *Energetic Tank*, 607 F. Supp. 3d at 368. Because "[t]hese two oversights substantially worsened the collision," the district court concluded that they increased ALNIC's liability. *Id.* Indeed, the district court deemed ALNIC's failure to mitigate the damage after the collision "ALNIC's most inexcusable fault." *Id.*

Energetic claims once more that the district court's causation finding was clearly erroneous, arguing that "nothing in the record support[ed] the [district] court's finding that . . . ALNIC's crew could have done anything to stop the sweep, halt the massive tanker's forward momentum, or otherwise mitigate the damage to MCCAIN" after the collision. Energetic Br. 59.

We disagree. To start, ALNIC's crew was obliged to exercise the "reasonable skill or care expected of a competent/prudent seaman to prevent the vessel from doing injury." *The Mount Apo* at [97] (citation omitted). This obligation applied when ALNIC entered the Singapore Strait without taking the steering off autopilot, as required by ALNIC's manager's own internal regulations, and without operating at Bridge Manning Level III, which required a dedicated anti-collision officer and a dedicated lookout. The obligation continued when ALNIC

failed first to slow down after she recognized MCCAIN's "wrong maneuver," and then to turn to port to reduce the angle of impact.

After the vessels collided, ALNIC's duty to exercise the "skill or care expected of a competent/prudent seaman" continued. *Id.* At that point, no reasonable mariner would have kept ALNIC's engine running or her autopilot engaged. To the contrary, mariners "cannot make a greater mistake" than to suppose that automatic steering alone will extricate them from danger. *The Fogo* [1967] 2 Lloyd's Rep. 208, 221 RHC. For ALNIC to "dall[y] in autopilot" after the collision was a breach of her duty. *Energetic Tank*, 607 F. Supp. 3d at 367.

These faults, too, were causative. Energetic observes that the United States's expert did not opine upon what might have happened if ALNIC's post-collision conduct had been different. But as the district court noted, that same expert testified that (1) ALNIC's rotation after the collision was caused in part by her autopilot and her running engine; and (2) that rotation exacerbated the gash in MCCAIN's hull. On this basis, the district court's finding that ALNIC's inaction exacerbated the collision damage was plainly "permissible." *Vasquez*, 582 F.3d at 297 (internal quotation marks omitted). Consequently, we find no error in the district court's conclusion that ALNIC's conduct shortly before and immediately after impact was negligent.

### d. When Allocating Fault, the District Court Properly Considered ALNIC's Crewmembers' False Statements.

Finally, the district court considered the false log entries and other misrepresentations by ALNIC's crew when allocating liability. As noted above, ALNIC's log misrepresented her staffing, engine speed, and steering mode, and her crewmembers misrepresented that they had not seen MCCAIN's red-over-red lights. The district court concluded that although these lies were not "causative," they

"underscore[d] the culpability of [ALNIC's] crew." *Energetic Tank*, 607 F. Supp. 3d at 369.

Energetic resists this conclusion. It claims that the district court erroneously drew upon the false statements of ALNIC's crewmembers to define the proper standard of care, rather than merely to support factual findings.

We see no such error. Under Singapore law, "only causative fault is relevant" to the apportionment of liability. *The Mount Apo* at [95]. But we must consider *both* "blameworthiness and causative potency." *Id.* (internal quotation marks, citation, and emphasis omitted). Thus, once we have determined that a fault is "causative," we must consider that fault's "nature and quality." *Id.* (internal quotation marks and emphasis omitted). We may presume that logs falsified by a vessel's crew place her "in the best possible light." *The Lok Vivek* [1995] 2 Lloyd's Rep. 230, 236 LHC; *see also id.* at 239–40; *cf. Otal II*, 494 F.3d at 59. This presumption, in turn, can inform our assessment of the "nature and quality" of the vessel's faults. *The Mount Apo* at [95]. The false statements of ALNIC's crewmembers bore upon the same faults that the district court found causative. That ALNIC's crew thought those faults were important to hide underscores their gravity. The district court properly considered this concealment.

*** 

We find no clear error in the district court's factual findings and no error in its legal conclusions. We therefore must affirm the district court's judgment rejecting Energetic's counterclaim against the United States for vessel damages. In so doing, we also must affirm

the district court's apportionment of fault: 20% to ALNIC and 80% to MCCAIN.

## V.      Sovereign Immunity.

Energetic also sought contribution and indemnification from the United States for damages that Energetic might later be found to owe the Sailor-Claimants.

To proceed, Energetic's claims must first overcome the United States's sovereign immunity. "[T]he United States, as sovereign, is generally immune from suits seeking money damages." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024). Such suits therefore may not proceed without the United States's "consent." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Indeed, "the existence of consent is a prerequisite for jurisdiction." *Id.* "Congress may choose to waive" the United States's immunity, but it must do so "unmistakably." *Kirtz*, 601 U.S. at 48 (internal quotation marks omitted and alterations incorporated). And the Supreme Court has held that to waive sovereign immunity against suits by members of the armed forces for damages relating to their service, Congress must speak even more clearly. Thus, for example, the broad-brush immunity waiver in the Federal Tort Claims Act ("FTCA") does not apply to such service-related suits.[18] *See Feres v. United States*, 340 U.S. 135, 146 (1950); *United States v. Johnson*, 481 U.S. 681, 692 (1987). The same is true when a party seeks indemnification from the United States based on such claims. *See Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 673–74 (1977); *Lockheed Aircraft Corp. v. United*

---

[18] The FTCA provides: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674.

*States*, 460 U.S. 190, 197 n.8 (1983).  This principle primarily reflects Congress's interests in preventing "civilian court[s]" from "second-guess[ing] military decisions" and in preserving "essential military discipline."  *United States v. Shearer*, 473 U.S. 52, 57 (1985).

The district court concluded that *Feres* and its successors barred Energetic's contribution and indemnification claims.    Energetic challenges that conclusion.

Energetic does not contest that the Sailor-Claimants are members of the armed forces (or their representatives) bringing suits for damages relating to their service.  Still, Energetic notes that this case, unlike *Feres* and *Stencel*, arises under not the FTCA but the Suits in Admiralty Act ("SIAA") and the Public Vessels Act ("PVA").[19] Energetic further observes that its claims concern not direct damages but contribution or indemnification following the United States's own invocation of federal jurisdiction.    These procedural differences matter, Energetic insists, because the Government has already produced evidence of its own fault in the Phase 1 trial, thereby disclaiming any further interest in military discipline.    Finally, Energetic notes some potential unfairness: to the extent that joint-and-several liability is available here, Energetic may have to pay the full

---

[19] The SIAA provides: "In a civil action in admiralty brought by the United States . . . an admiralty claim in personam may be filed or a setoff claimed against the United States."  46 U.S.C. § 30903(a).

The PVA states: "If the United States brings a civil action in admiralty for damages caused by a privately owned vessel, the owner of the vessel, or the successor in interest, may file a counterclaim in personam, or claim a setoff, against the United States for damages arising out of the same subject matter."  46 U.S.C. § 31102(b).

value of the Sailor-Claimants' damages claims, even though ALNIC was only 20% at fault for the collision.

We agree with the district court that the United States' sovereign immunity bars Energetic's contribution and indemnification claims. We have held that the "*Feres* doctrine" bars direct claims against the United States under the PVA and the SIAA, despite those statutes' immunity waivers. *Cusanelli v. Klaver*, 698 F.2d 82, 85 (2d Cir. 1983); *cf. Dobson v. United States*, 27 F.2d 807, 809 (2d Cir. 1928).[20]    The alternative would create an "artificial distinction . . . between accidents to servicemen on land and at sea." *Hillier v. S. Towing Co.*, 714 F.2d 714, 724 (7th Cir. 1983). Thus, the statutory differences between *Feres* and this case referenced by Energetic do not support Energetic's position.

Neither are the procedural differences significant. The Supreme Court has instructed that the reasons for barring "third-party indemnity action[s]" by servicemembers are "essentially the same" as those for barring "direct action[s]." *Stencel*, 431 U.S. at 673; *see also Vulcan Materials Co. v. Massiah*, 645 F.3d 249, 267 (4th Cir. 2011). We believe the same is true for contribution claims. *See In re McAllister Towing & Transp. Co.*, 432 F.3d 216, 224 (3d Cir. 2005). And as a general matter, "jurisdictional limitations based on sovereign immunity apply equally to counterclaims against the Government," where the United States has invoked federal jurisdiction for other purposes. *United States v. Forma*, 42 F.3d 759, 764 (2d Cir. 1994) (internal quotation marks and citation omitted).[21]    In this case, we

---

[20] It appears that each of our sister circuits to have considered the question has agreed. *See Blakey v. U.S.S. Iowa*, 991 F.2d 148, 151–52 (4th Cir. 1993) (collecting cases).

[21] Our precedents recognize a "recoupment-counterclaim" exception to this rule, under which a party sued by the United States may subtract the

need do little more than combine these principles to hold that sovereign immunity bars Energetic's contribution and indemnification claims. Not to do so would create an aberrant exception to *Feres*'s ordinary sweep.

We reject as well Energetic's suggestion that the *Feres* doctrine does not apply because the Government participated in the Phase 1 trial. It is true that *Feres* reflects the judiciary's reluctance to "second-guess[] military orders" or to "require members of the Armed Services to testify in court as to each other's decisions and actions," and that these scenarios have already materialized here. *Stencel*, 431 U.S. at 673. But we do not "inquire into 'the extent to which particular'" proceedings, such as the Phase 2 trial, "would call into question military discipline and decisionmaking." *Doe v. Hagenbeck*, 870 F.3d 36, 45 (2d Cir. 2017) (internal quotation marks omitted) (quoting *United States v. Stanley*, 483 U.S. 669, 682 (1987)). *Feres* reflects our reading of Congress's enactments. *See* 340 U.S. at 140, 146. Nothing in either the SIAA or the PVA permits case-by-case consideration of military needs.

We recognize that MCCAIN, not ALNIC, was overwhelmingly responsible for the collision. We recognize, too, that several jurists—including some on this court—have criticized the *Feres* doctrine. *See, e.g.*, *Taber v. Maine*, 67 F.3d 1029, 1038–42 (2d Cir. 1995). Even so, what Energetic would call that doctrine's extension, we view as only its

---

amount it is owed by the United States from any damages it must pay. *See Forma*, 42 F.3d at 764–65. The PVA and SIAA also allow parties to claim a "setoff" that accomplishes largely the same thing. 46 U.S.C. §§ 31102(b), 30903(a). While these options might have been available to Energetic at the outset of this action, it failed to timely raise them in the district court. Accordingly, we decline its request to remand for the district court to consider them now.

ordinary application to new facts. It is not for us to say that the United States's assertion of immunity here goes too far.

**CONCLUSION**

We DISMISS the Sailor-Claimants' cross-appeals (Nos. 22-2871 and 22-2883). We AFFIRM the judgments of the district court (1) apportioning liability and (2) dismissing Energetic's contribution and indemnification claims in both Energetic's appeals (Nos. 22-1765 and 22-2774).